IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
December 5, 2011 Session

**EARL McLEMORE, BY AND THROUGH JEAN McLEMORE, AS ADMINISTRATRIX OF THE ESTATE OF EARL McLEMORE, DECEASED FOR THE USE AND BENEFIT OF THE WRONGFUL DEATH BENEFICIARIES OF EARL McLEMORE v. ELIZABETHTON MEDICAL INVESTORS, LIMITED PARTNERSHIP d/b/a LIFE CARE CENTER OF ELIZABETHTON, et al.**

**Appeal from the Circuit Court for Carter County**
**No. C10129     Hon. Thomas J. Seeley, Jr., Judge**

**No. E2010-01939-COA-R3-CV Filed June 22, 2012**

This is a survivor and wrongful death suit arising out of the alleged neglect and abuse of Earl McLemore while he was a resident in a nursing home, Life Care Center of Elizabethton, which is located in Elizabethton, and is owned and operated by defendants. The suit was filed in the Circuit Court for Carter County, and following a ten day trial in May of 2010, the jury returned verdicts in favor of plaintiff and against all defendants. The jury awarded compensatory damages of $500,000.00 and punitive damages of $4,250,000.00. The Trial Court suggested a remittitur of compensatory damages to $225,000.00, but sustained the punitive damages award. Defendants/appellants appealed the verdict on numerous grounds. We affirm the Judgment of the Trial Court.

**Tenn. R. App. P.3 Appeal as of Right; Judgment of the Circuit Court Affirmed.**

HERSCHEL PICKENS FRANKS, P.J., delivered the opinion of the Court, in which CHARLES D. SUSANO, JR., J., and D. MICHAEL SWINEY, J., joined.

Roger W. Dickson, Travis R. McDonough, Robert F. Parsley, Kevin D. Hudson, and Jade D. Dodds, Chattanooga, Tennessee, for the appellants, Elizabethton Medical Investors, Limited Partnership d/b/a Life Care Center of Elizabethton; Elizabethton Medical Investors, LLC; and Life Care Centers of America, Inc. [1]

---

[1]Appellants' counsel did not represent appellants in the Trial Court.

M. Chad Trammell, Texarkana, Arkansas, S. Drake Martin, Grayton Beach, Florida, Tony Seaton, Johnson City, Tennessee, and Brian G. Brooks, Greenbrier, Arkansas, for the appellee, Jean McLemore.

**OPINION**

**Background**

Plaintiff's complaint was filed on March 13, 2006 by Deceased's surviving spouse, Jean McLemore, for "the use and benefit of the wrongful death benefits of the wrongful death beneficiaries" of McLemore. At least fifteen entities were named as defendants, including Life Care C enters of America, Inc., (LCCA). All but three defendants were dismissed prior to trial. The complaint alleges claims for negligence, negligence *per se*, gross negligence, medical malpractice, violation of the Tennessee Adult Protection Act and violation of the Tennessee Consumer Protection Act. The complaint alleges that while in the care of the defendants, Mr. McLemore suffered injuries, including decubitus ulcers, contusions and bruises, pain and suffering, mental anguish, infection, poor hygiene and death. Plaintiff sought compensatory and punitive damages. The complaint was amended twice and a claim for misrepresentation was added. Plaintiff narrowed her claims, focusing on " understaffing" and "undersupplying" in her Second Amended Complaint. The answer specifically stated that defendant LCCA managed the operations of LCCE at all material times.

On July 20, 2009, defendants filed a motion for partial summary judgment on the pleadings asking the Trial Court to dismiss the claims based on ordinary negligence, gross negligence, negligence *per se*, the Tennessee Adult Protection Act, the Tennessee Consumer Protection Act and misrepresentation. They contended that under the Court's holding in *Estate of French v. Stratford House*, E2008-00539-COA-R3-CV. 2009 WL 211898 (Tenn. Ct. App. Jan. 29, 2009), only plaintiff's claim under the Tennessee Medical Malpractice Act (TMMA) should be sustained as *French* held that claims of "understaffing" and "undersupplying" sounded in medical malpractice. On July 27, 2009, plaintiff voluntarily dismissed all claims other than ordinary negligence, medical malpractice, wrongful death and violation of the Tennessee Adult Protection Act. Plaintiff also pared down the number of defendants, dismissing all but Elizabethton Medical Investors Limited Partnership, d/b/a Life Care Center of Elizabethton; Elizabethton Medical Investors, LLC; and Life Care Centers of America, Inc. These three defendants will be referred to as "Life Care" or "defendants" when referred to as a group. On the same day the Trial Court denied defendants' motion for summary judgment with regard to the negligence claim but dismissed the TAPA claim.[2]

---

[2] The order is not in the record, however the parties agree that these rulings were made by the Trial Court.

Also on July 27, 2009, defendants filed a "Pretrial Request for Special Jury Instructions" and a "Proposed Jury Verdict Form." Both documents addressed medical malpractice claims only and defendants specifically stated that the proposed jury instructions were "in accordance with the requirements of the Tennessee Medical Malpractice Act as applicable to the alleged actions and omissions of licensed administrators and/or operators of nursing home facilities . . . .".

During a pre-trial hearing on plaintiff's motions to compel discovery depositions of LCCA corporate employees, counsel for Life Care made the following statement which is important to an issue raised on appeal:

> But as to Kathy Murray, Your Honor, she is the COO, Chief Operating Officer, for Life Care Centers of America. And I want to say this up front, part of the argument that we just heard about, about control and who is running things at Life Care Center of Elizabethton, there is no dispute. He [counsel for plaintiff] said he thought we would, he would find Life Care logo stamps on policies and procedures. He will, because there is no dispute in this case that Life Care Centers of America runs and manages the Life Care Center of Elizabethton. There's no dispute about that. That was admitted in the original answer. And unlike the Smart[t] Corporation case, or the Smart[t] case again [sic] NHC that he referenced where the, the president and the COO testified, there were many issues in that case. . . . Issues in that case about which Defendants controlled the facility. Well, we don't have that issue in this case. Life Care Centers of America did control the operation of Life Care Center of Elizabethton. That's agreed and stipulated.

At the same hearing, counsel for Life Care sought an order that LCCA financial documents would not have to be produced to plaintiff unless the trial reached the punitive damage stage. The Trial Court expressed concern that the production would consist of a lot of documents and that it would not be possible for plaintiff's counsel and their experts to properly review them and prepare for the punitive damage stage of the trial without causing a significant delay or even to cause a bifurcation of the trial. Defendants' counsel assured the Court that just one document, a federal tax return from the previous year, would suffice to provide all of the financial information plaintiff would need for the punitive damage stage as follows:

> What we're talking about are tax returns that show net worth. That's what Court's have orders [sic] to be produced in these cases . . . that I've tried. Tax returns for the last year. So it's not going to be a whole bunch of documents, but a tax return is more, more than a few pages, 15 or 20 pages. But it's only one document. At least

that's the way we've handled it in the other cases.[3]

## The Trial

The trial of this case commenced on April 5, 2010 and ended on April 15, 2010. At the close of plaintiff's case defendants did not move for a directed verdict. The defense presented its case, and plaintiff did not put on any evidence of rebuttal. Again, the defendants did not make a motion for a directed verdict.

At the close of the evidence, plaintiff withdrew her claim for ordinary negligence. The stated reason being was "to move the case forward." The Trial Court ruled that plaintiff was allowed to suggest a dollar amount for damages in the closing argument. The Trial Court instructed the jury on the law, including medical malpractice, and the Court told the jury that when it used the term "Life Care" in the instructions, the term included Life Care Centers of America, Life Care Center of Elizabethton, Elizabethton Medical Investors, L. P., their officers, agents and employees.[4] The Trial Court told the jury that plaintiff had asked for punitive damages and informed the jury that the purpose of punitive damages was not compensatory but was to punish and deter others from committing similar wrongs. The Court explained that in order for them to award plaintiff punitive damages they would have to find that plaintiff had shown by clear and convincing evidence that Life Care had acted recklessly. The Court also instructed the jury that if they decided to award punitive damages, they were not to decide the amount until after notifying the Court of the finding of recklessness.

Following closing arguments by the parties, the jury was retired to deliberate, and during the time the jury was deliberating, counsel for defendants asked the Trial Court to make a change to the original verdict form that had been given to the jury. The Court acquiesced and the change was made and provided to the jury. Although it was the defendants who requested the change to the verdict form, the defendants made a motion for a mistrial "on the basis of the original verdict form being with the jury for an hour and a half yesterday." The motion was denied.

The jury returned their verdict finding that defendants' malpractice was a substantial

_____

[3]This statement is contrary to defendants' position on appeal regarding the proof of LCCA's finances that were submitted to the jury.

[4] This instruction is consistent with the defendants' statement in their answer to the second amended complaint that LCCA managed the operations of LCCE at all material times and defendants' stipulation at a pre-trial hearing that Life Care Centers of America "runs and manages Life Care Center of Elizabethton", and "Life Care Centers of America did control the operation of Life Care Center of Elizabethton. That's agreed and stipulated." Further, defendants did not object to this instruction during the charge conference with the Court.

factor in producing damages to Mr. McLemore but was not the cause of his death. They awarded $250,000 for his pain and suffering, $150,000 for his loss of ability to enjoy life and $100,000 for Mrs. McLemore's loss of consortium. The jury also found by clear and convincing evidence that the conduct of Life Care, upon which they based their finding of medical malpractice, was reckless.

The Trial Court instructed the jurors on the *Hodges* factors that they should consider when determining the amount of punitive damages. Those factors are: Life Cares's net worth and financial condition, the objectionable nature of Life Care's conduct to plaintiff; Life Care's awareness of the amount of harm being caused and its motivation in causing the harm; the duration of Life Care's misconduct and whether they attempted to conceal the conduct; the amount of money plaintiff has spent in the attempt to recover the losses; whether Life Care had profited from the activity and, if so, whether the punitive award should be in excess of the profit in order to deter similar future behavior; the number and amount of previous punitive damages awarded against Life Care based on the same wrongful act; whether once the misconduct became known to LCCA, it tried to remedy the situation or offered a prompt and fair settlement for the actual harm caused; and any other circumstances shown by the evidence that bears on determining the proper amount of punitive award.

Plaintiff then presented its proof in connection with the amount of the punitive damages award, and when plaintiff rested on the punitive damage phase of the trial, the defendants again did not make a motion a directed verdict at the close of proof on punitive damages.

According to the final judgment entered on the trial date on May 11, 2010, a jury of twelve returned an unanimous verdict as follows:

1.      That from the preponderance of the evidence there WAS medical malpractice on the part of Life Care which caused, or directly contributed, that was a substantial factor in producing, injuries to Earl McLemore;

2.      That from the preponderance of the evidence there WAS NOT medical malpractice on the part of Life Care which caused, or directly contributed, that was a substantial factor in producing, the death of Earl McLemore.

The jury decided the total amount of compensatory damages to be awarded against Life Care was as follows:

1.      Pain and suffering (both physical, mental, and disfigurement):
        $250,000.00 (Two Hundred Fifty Thousand Dollars and No Cents)

2.      Loss of ability to enjoy life:
        $150,000.00 (One Hundred Fifty Thousand Dollars and No Cents)

3.   Loss of consortium:
     $100,000.00 (One Hundred Thousand Dollars and No Cents)

The jury, having awarded damages to the Plaintiff, next found by clear and convincing evidence that the conduct of Life Care, upon which the jury based its finding of medical malpractice, was reckless. Following a bifurcated hearing on the issue of punitive damages, the jury returned the following verdict:

Punitive Damages:
$4,250,000.00 (Four Million Two Hundred Fifty Thousand Dollars and No Cents.)

It is therefore ORDERED AND ADJUDGED AND DECREED that the plaintiff recover from the defendants compensatory damages in the amount of $500,000 (Five Hundred Thousand Dollars); and that with respect to punitive damages, the court's Findings of Fact and Conclusions of Law with respect to the punitive damage verdict, appended hereto, are hereby incorporated herein and made a part of the Judgment of the court.

Also on May 11, 2010, the Trial Court entered a "Punitive Damage Findings of Fact and Conclusions of Law" as required in *Hodges v. S.C. Toof & Co.,* 833 S.W.2d 896, 900 (Tenn. 1992). The Trial Court stated that the law required it to "determine whether there was material evidence of a clear and convincing nature to support an award for punitive damages" while still taking the strongest legitimate view of Plaintiffs' evidence. *Wasielewski v. K Mart Corp.*, 891 S.W.2d 916, 919(Tenn. Ct. App. 1994). The Trial Court made extensive findings of fact and after a thorough review concluded that, "in the view most favorable to Plaintiff, material evidence exists from which a jury could conclude by clear and convincing evidence that Life Care acted with reckless disregard for the safety and well-being of Earl McLemore" and approved the jury's punitive damage award.

On June 3, 2010, defendants filed a Motion to Amend Findings of Fact and Judgment; for a New Trial; and/or for a Remittitur. Defendants contended the jury verdict was error because the Trial Court permitted plaintiff's counsel to "suggest a dollar value and argue the worth or monetary value of the plaintiff decedent's 'pain and suffering'". They further contended that the finding by the jury and confirmation by the Trial Court that defendants' conduct was reckless was not supported by the evidence. They also argued that the compensatory damage award was not supported by the evidence and that the punitive damage verdict was excessive under a due process analysis. Plaintiff responded that any argument by defendants regarding the sufficiency of the evidence was waived by defendants when they failed to make a motion for a directed verdict at the close of plaintiff's proof and/or at the close of all of evidence.

Defendants' motion was heard, and the Trial Court suggested that plaintiff grant the

defendants a remittitur of the judgment for compensatory damages in the amount of $275,000, thus reducing the award to $225,000. The remaining requests raised in defendants' motion were denied.

The transcript of the August 12, 2010 hearing reflects that the Trial Court stated that "there was substantial evidence in this case from which the jury could find and which this Court finds that there was clear and convincing evidence that the defendant Life Care Center of Elizabethton and hence its corporate parents did act recklessly." The Court continued its statement on liability, finding that "there was substantial evidence of short staffing . . . whereby LPNs and CNAs did not have sufficient time to turn appropriately the residents, to clean their residents, to perform other necessary functions to care for their residents". The Court also noted that the short staffing and the problems ensuing were communicated to the "superiors" at Life Care Center of Elizabethton and, in all likelihood, to corporate headquarters." The Court stated that it agreed with the amount of the jury's punitive damage award but was "bothered" by the amount of the compensatory damage award. The Court was of the opinion that Mr. McLemore was "probably terminal" when he was admitted to Life Care, thus his life expectancy was certainly limited. Based on this finding, the Trial Court, in its capacity as 13th juror, stated that it was "mere conjecture" to say that he sustained $250,000 in pain and suffering and loss of enjoyment of life. The Court also concluded that given Mr. McLemore's condition when he entered Life Care, it could not see how Mrs. McLemore could have lost "a whole lot of either services or companionship." Thus, there was a suggestion that the award for pain and suffering and loss of enjoyment of life be reduced to $175,000 and the loss of consortium award be reduced to $50,000. An order reflecting the suggested remittitur and the denial of a new trial was entered on August 20, 2010. On August 19, 2010, plaintiff filed, under protest, a remittitur as suggested by the Trial Court, remitting the compensatory damage award to $225,000.

All defendants filed a joint notice of appeal on September 16, 2010.

**The Appeal**

This case was heard before a jury. Tenn. R. App. P. 13(d) provides that "[f]indings of fact by a jury in civil actions shall be set aside only if there is no material evidence to support the verdict." The Tennessee Supreme Court in *Barnes v. Goodyear Tire & Ruber Co.,* 48 S.W.3d 698 (Tenn. 2000) set out the standard for reviewing material evidence in support of a jury's verdict:

When addressing whether there is material evidence to support a verdict, an appellate court shall: (1) take the strongest legitimate view of all the evidence in favor of the verdict; (2) assume the truth of all evidence that supports the verdict; (3) allow all reasonable inferences to sustain the verdict; and (4) discard all [countervailing] evidence. *Crabtree Masonry Co. v. C & R Constr., Inc.,* 575 S.W.2d 4, 5 (Tenn.1978);

*Black v. Quinn,* 646 S.W.2d 437, 439-40 (Tenn. App.1982). Appellate courts shall neither reweigh the evidence nor decide where the preponderance of the evidence lies. If the record contains "any material evidence to support the verdict, [the jury's findings] must be affirmed; if it were otherwise, the parties would be deprived of their constitutional right to trial by jury." *Crabtree Masonry Co.,* 575 S.W.2d at 5.

*Barnes,* 48 S.W.3d at 704-05 (Tenn.2000).

This Court's review of whether sufficient evidence exists to support the verdict requires that we assume the truth of all evidence that supports the verdict and discard all countervailing evidence. *Barnes,* 48 S.W.3d at 704 (citing *Crabtree* at 5). Then, if the record contains any material evidence to support the verdict the jury's findings must be affirmed. *Id.*

Our review of questions of law is *de novo* without a presumption of correctness afforded to the lower court's conclusions of law. *Blair v. Brownson*, 197 S.W.3d 681, 683 (Tenn. 2006)(citing *State ex rel. Pope v. U.S. Fire Ins. Co.,* 145 S.W.3d 529, 533 (Tenn.2004).

Appellants also raise the issue of whether the punitive damages award was excessive to the point that the award violated its constitutional due process rights and whether the Trial Court erred when it affirmed the punitive damage award after a *Hodges* review. When reviewing the amount of the punitive damage award under a due process analysis our review is *de novo* to ensure the award is based on an application of the law rather than the jury's caprice. *LaMore v. Check Advance of Tennessee, LLC*, E2009-00442-COA-R3-CV, 2010 WL 323077 at * 8 (Tenn. Ct. App. Jan. 28, 2010)(citing *Goff v. Elmo Greer & Sons Const. Co., Inc.,* 297 S.W.3d 175, 187, 190 (Tenn. 2009). "Our review for material evidence must take the strongest legitimate view of all the evidence in favor of the verdict, ... assume the truth of all that tends to support it, allowing all reasonable inferences to sustain the verdict, and ... discard all to the contrary." *LaMore* at *8 (citing *Flax v. DaimlerChrysler Corp.,* 272 S.W.3d 521, 532 (Tenn.2008). We do not re-weigh the evidence. *Id.* As appellants have challenged the Trial Court's *Hodges* review, we must engage in an intermediate step of reviewing that review to determine whether the Trial Court conducted the review as required by *Hodges* and of reviewing its findings using the standard of review applicable to decisions of trial courts sitting without a jury. *LaMore* at *8 (citing *Coffey v. Fayette Tubular Products,* 929 S.W.2d 326, 331 (Tenn.1996). In that step we presume the factual findings are correct, unless the evidence preponderates against the trial court's findings. *Id.*

All of the defendants jointly filed this appeal. Five of the seven issues appellants raise are in connection with the punitive damage award. Appellants also appeal the Trial Court's denial of their motion for a new trial and the Trial Court's jury instruction on the burden of proof for a medical malpractice claim. Plaintiff/appellee's only issue on appeal is whether the Trial Court's suggestion of remittitur of the compensatory damage award was error.

We will consider the appellants' issues in the order raised in their brief.

A.    May a punitive damage award be awarded against a corporation for recklessness without proof of conscious disregard of an unreasonable risk of harm.

On this issue, appellants argue there was no proof of a conscious disregard of an unreasonable harm by Life Care, and the award was in error.

The Tennessee Supreme Court, in *Goff*, summarized the different purposes served by compensatory and punitive damages. Compensatory damages are intended to compensate an injured plaintiff for personal injury or property damage and thereby make the plaintiff whole again. *Goff* at 187. Punitive damages, in contrast, are intended to "punish a defendant, to deter him from committing acts of a similar nature, and to make a public example of him." *Goff* at 187. Punitive damages are appropriate only in the most egregious cases and a verdict imposing such damages must be supported by clear and convincing evidence that the defendant acted intentionally, fraudulently, maliciously, or recklessly. *Goff* at 187. The Court defined clear and convincing evidence as evidence that leaves "no serious or substantial doubt about the correctness of the conclusions drawn." *Id.* The Court further explained that clear and convincing evidence must be such that the truth of the facts asserted be "highly probable." *Goff* at 187.

Here, the Trial Court instructed the jury that it could consider an award of punitive damages if plaintiff had shown by clear and convincing evidence that Life Care had acted recklessly. The Trial Court further instructed the jury that "a person acts recklessly when the person is aware of, but consciously disregards a substantial or unjustifiable risk or damage to another. Disregarding the risk must be a gross deviation from the standard of care that an ordinary person would use under all the circumstances." Both parties agreed to this jury charge and the charge is in concurrence with the case law of Tennessee. *See Hodges* at 901; *Flax v. DaimlerChrysler Corp*, 272 S.W.3d 521, 531 (Tenn. 2008).

Defendants asked this Court to review whether there was any material evidence presented to the jury to support the verdict that appellants were reckless when they understaffed the LCCE facility. Our review of this issue is limited to determining whether any material evidence supports the jury's conclusion that there is no serious or substantial doubt that appellants consciously disregarded a known, substantial, and unjustifiable risk, here the understaffing of the LCCE facility, to the plaintiff's detriment. *Flax* at 532.

Appellants maintain that plaintiff/appellee "did not prove that Life Care manifested conscious disregard of the risk of understaffing in Elizabethton". Appellants state in their brief that although staff levels at Elizabethton were approved by "high-level management in Life Care's corporate headquarters . . . . [t]here is no evidence that these managers thought

Elizabethton was understaffed, and there is no evidence these managers chose to keep staff levels there lower than required despite a risk of harm to patients."

It is interesting that appellants have made this argument to the Court, in view of the jury charge, which they agreed to, that the term "Life Care" includes all of the defendant entities and their officers, agents and employees. In agreement with that jury charge, appellants stipulated that "Life Care Centers of America runs and manages Life Care Center of Elizabethton, Life Care Centers of America did control the operation of Life Care Center of Elizabethton". Moreover, their argument flies in the face of the agreed on jury charge and the stipulation. The argument seems to be made on behalf of LCCA alone even though all of the defendant entities have jointly appealed the Trial Court's final judgment and are represented by the same counsel on appeal.

However, we need not consider the merits of this argument as appellants have procedurally waived the right to appeal whether the jury was presented with material evidence that could support the finding of recklessness as they failed to make a motion for directed verdict at the close of plaintiff's proof and at the close of all of the proof pursuant to Tenn. R. Civ. P. 50. A Rule 50 motion for directed verdict provides a vehicle for deciding questions of law. The question presented by a Rule 50 motion is whether the plaintiff has presented sufficient evidence to create an issue of fact for the jury to decide. *Spann v. Abraham,* 36 S.W.3d 452, 462 (Tenn. Ct. App.1999); *Ingram v. Earthman,* 993 S.W.2d 611, 626 (Tenn. Ct. App.1998). For this Court to review the sufficiency of the evidence on appeal, a motion for a directed verdict must have been made at the conclusion of all of the proof and renewed in a post judgment motion following the jury's verdict. *Steele v. Columbia/HCA Health Care Corp.*, W2001-01692-COA-R3-CV, 2002 WL 1000181 at * 3 (Tenn. Ct. App. May 13, 2002)(citing *Cortez v. Alutech, Inc.,* 941 S.W.2d 891, 894 (Tenn. Ct. App. 1996); Robert Banks, Jr. & June F. Entman, *Tennessee Civil Procedure* §§ 12-1(a) 12-1(d)-(1999)).

The facts in *Steele* are similar to the issue before this Court. In *Steele,* a medical malpractice case, the defendants failed to move for a directed verdict at the end of plaintiff's proof or at the end of all of the proof. The defendants then filed a motion for new trial, in part, based on the assertion that "[t]he Court should order a new trial in this action because plaintiff failed to present expert medical testimony sufficient to prevail as a matter of law." *Steele* at * 3. The motion for a new trial was denied and the defendants appealed to this Court. We noted that appellants were challenging the legal sufficiency of plaintiff's evidence regarding standard of care and causation, not the admissibility or overall weight of the expert witnesses testimony. We stated that "the question of whether evidence is sufficient to support a jury verdict is tested by a motion for a directed verdict and, in order for the trial court to consider the sufficiency of the evidence in a post trial motion, the moving party must have made a motion for a directed verdict at the conclusion of all of the proof." *Id*. (citing Tenn. R. Civ. P. 50.01 & 50.02; *Cortez* at 894).

*Also see, Robert Banks, Jr. & June F. Entman*, *Tennessee Civil Procedure* §§ 12-1(a) 12-1(d)-(1999). *See also In re Estate of Calfee*, E2000-01720-COA-R3-CV, 2001 WL 584248 at * 2 (Tenn. Ct. App. May 31, 2001).

Accordingly, without having made a motion for directed verdict defendants cannot now challenge the sufficiency of the evidence to support the jury's finding of recklessness on appeal.

> B.  Did the Trial Court err by sustaining the punitive damages award when it applied the *Hodges* factors?

In *Hodges*, a case in which punitive damages were awarded by a jury, the Tennessee Supreme Court instructed trial courts to conduct a special review of a jury's determination of the amount of punitive damages. The Court provided that in a trial where punitive damages are sought, the trial court, upon motion of defendant, shall bifurcate the trial. During the first phase, the fact finder shall determine the liability for, and the amount of, compensatory damages and whether the defendant is liable for punitive damages. If the fact finder finds the defendant liable for punitive damages, the amount of such damages shall then be determined in an immediate, separate proceeding. During this second phase, the fact finder shall be instructed to consider, to the extent relevant, at least the following:

> (1) The defendant's financial affairs, financial condition, and net worth;

> (2) The nature and reprehensibility of defendant's wrongdoing, for example
> > (A) The impact of defendant's conduct on the plaintiff, or
> > (B) The relationship of defendant to plaintiff;

> (3) The defendant's awareness of the amount of harm being caused and defendant's motivation in causing the harm;

> (4) The duration of defendant's misconduct and whether defendant attempted to conceal the conduct;

> (5) The expense plaintiff has borne in the attempt to recover the losses;

> (6) Whether defendant profited from the activity, and if defendant did profit, whether the punitive award should be in excess of the profit in order to deter similar future behavior;

> (7) Whether, and the extent to which, defendant has been subjected to previous punitive damage awards based upon the same wrongful act;

> (8) Whether, once the misconduct became known to defendant, defendant took remedial action or attempted to make amends by offering a prompt and fair settlement

-11-

for actual harm caused; and

(9) Any other circumstances shown by the evidence that bear on determining the proper amount of the punitive award.

*Hodges* at 901 - 902.

These factors have been referred to as "*Hodges* factors" by the Tennessee courts. *Hodges* further provides that once the jury has made an award of punitive damages, the trial judge shall review the award and give consideration to all matters on which the jury was required to be instructed, including the *Hodges* factors. After such review, *Hodges* holds that the trial court shall clearly set forth the reasons for decreasing or approving all punitive awards in findings of fact and conclusions of law. The trial court is required to demonstrate a consideration of all factors on which the jury is instructed. *Id*. at 902. The required review of a punitive damages award by the trial court is referred to as a *Hodges* review and the Supreme Court, in *Coffey v. Fayette Tublar Prods*., 929 S. W. 2d 326, 328 (Tenn. 1996) described the review as "thorough".

In this case, upon a jury finding that defendants had acted recklessly and that punitive damages were in order, the Trial Court instructed the jury on the need to consider the *Hodges* factors when determining the amount of the award. The Trial Court also conducted a *Hodges* review and issued a "Punitive Damages Findings of Fact and Conclusions of Law". In that document the Trial Court stated that it found "in the view most favorable to the Plaintiffs, material evidence exists from which a jury could conclude by clear and convincing evidence that Life Care acted with reckless disregard for the safety and well-being of Earl McLemore.", as we previously noted. The Trial Court then sustained the jury's award of punitive damages in the amount of $4,250,000.00 based "upon careful review of the nature and amount of the jury's punitive damage award, and consideration of all matters on which the jury was instructed in making the punitive damage award . . . ."

On appeal, appellants claim the Trial Court did "only a perfunctory material evidence review and that the Trial Court misconstrued and departed from the factual record when it did the *Hodges* review." Appellants' assignment of error as to the *Hodges* review is that the Trial Court was required to "evaluate the facts in a manner akin to its role as thirteenth juror" and not merely do a material evidence review. [5] The Tennessee Supreme Court, in *Flax*, discussed the standard of review a trial court must apply when reviewing a jury's punitive damages award pursuant to *Hodges.* In *Flax* the Supreme Court made it clear that the trial court does not act as a thirteenth juror nor does it conduct a *de novo* review and re-weigh the evidence. As articulated by the Supreme Court in *Flax*, the standard of review employed by

---

[5] A trial court acts as the thirteenth juror when it reviews the evidence to determine if the jury's verdict is or is not supported by the weight of the evidence. *Jones v. Idles*, 114 S.W.3d 911, 914 (Tenn. 2003).

a trial court when conducting a *Hodges* review of the dollar amount of a punitive damage award is as follows:

> We decided in *Hodges v. S.C. Toof & Company* that plaintiffs seeking punitive damages must present "clear and convincing evidence" that the defendant's acts that caused their injury were intentional, fraudulent, malicious, or reckless. *Hodges v. S.C. Toof & Co.,* 833 S.W.2d at 901 & n. 3. The clear and convincing evidence standard requires that the truth of the proposition sought to be established by the evidence be highly probable. *Teter v. Republic Parking Sys., Inc.,* 181 S.W.3d 330, 341 (Tenn. 2005). Clear and convincing evidence leaves no serious or substantial doubt about the correctness of the conclusions to be drawn from the evidence. *In re Valentine,* 79 S.W.3d 539, 546 (Tenn. 2002); *Hodges v. S.C. Toof & Co.,* 833 S.W.2d at 901 n. 3. Thus, clear and convincing evidence produces in the fact-finder's mind a firm belief or conviction regarding the truth of the facts sought to be established. *In re Tiffany B.,* 228 S.W.3d 148, 155–56 (Tenn.Ct.App.2007); *Hibdon v. Grabowski,* 195 S.W.3d 48, 63 (Tenn.Ct.App.2005); *Wiltcher v. Bradley,* 708 S.W.2d 407, 411 (Tenn.Ct.App.1985).
>
> Giving juries discretion to award punitive damages creates the potential that juries will use their verdicts to express biases against big businesses, especially ones without a strong local presence. *Honda Motor Co. v. Oberg,* 512 U.S. [415], 432, 114 S.Ct. 2331, [129 L.Ed.2d 336 (1994)]. Accordingly, in *Hodges v. S.C. Toof & Company,* **we required the trial courts to review punitive damages awards differently than the way they customarily review jury verdicts and compensatory damages awards. Rather than performing their traditional task as the thirteenth juror, we directed trial courts to "review the award, giving consideration to all matters on which the jury is required to be instructed."** *Hodges v. S.C. Toof & Co.,* 833 S.W.2d at 902. We also directed trial courts to "clearly set forth the reasons for decreasing or approving all punitive awards in findings of fact and conclusions of law demonstrating a consideration of all factors on which the jury is instructed." *Hodges v. S.C. Toof & Co.,* 833 S.W.2d at 902. (Emphasis supplied).

*Flax* at 555.

In this case, the Trial Court was not required to re-weigh the evidence as part of its *Hodges* review, but was required to determine if there was clear and convincing evidence presented to support the amount of the punitive damages awarded to plaintiff by the jury.

The Trial Court's analysis of the *Hodges* factors contained in its Findings of Fact and Conclusions of Law was six pages and is summarized as follows:

1.  <u>The defendant's net worth and financial condition</u>: The evidence presented by plaintiff as to LCCA's net worth and financial condition was not objected to be defendant. LCCA is a privately owned nursing home chain of more than

-13-

200 nursing homes with 30,000 residents. The 2007 tax return of LCCA showed $818,970,355 in gross receipts or sales and total assets of $574,122,999.

2. The nature and reprehensibility of defendant's wrongdoing, the impact of defendant's conduct on the plaintiff, and the relationship of the parties: The evidence showed that Mr. McLemore was frail and elderly and in need of good nursing home care. LCCA is a national provider or nursing home care. LCCA was aware of Mr. McLemore's needs and promised to provide care to meet those needs. LCCA was aware that if his needs were not met he could sustain serious harm. LCCA controlled the staffing and resources he needed but recklessly failed to provide him with the care he needed. As a result of this failure, his pressure ulcer worsened from stage II to stage IV, he developed infections, was malnourished and dehydrated upon his discharge from LCCE.

3. The defendant's awareness of the amount of harm being caused and defendant's motivation in causing the harm: The evidence showed that employees of LCCE reported the failures in care and the resulting injuries to their supervisors. LCCA controlled the budget and staffing and was accepting high needs residents who required more attention from staff. There was evidence that showed that taking high needs patients but limiting the staff to meet the needs increased profits. The Trial Court concluded that it was reasonable for the jury to conclude "that these increased profits were the motivation for Life Care's conduct which cause[d] grievous injury to Earl McLemore."

4. The duration of defendant's misconduct and whether defendant attempted to conceal the conduct; The evidence showed that LCCE increased the level of staffing during state inspections and that LCCA ordered this concealment.

5. The expense plaintiff has borne in the attempt to recover the losses: Although a specific dollar amount incurred by plaintiff was not provided to the jury, the jury was told that the case was tried twice, that more than fifty pre-trial depositions were taken and defense counsel made repeated references to the amount charged by plaintiff's medical expert.

6. Whether defendant profited from the activity, and if defendant did profit, whether the punitive award should be in excess of the profit in order to deter similar future behavior: The evidence was that the 2007 tax return showed $818,970,355 in gross receipts and assets of $574,122, 999. Plaintiff did not argue that the award should exceed the defendants' profits, only that it should be in an amount to deter LCCA from similar conduct in the future.

7. <u>Whether, and the extent to which, defendant has been subjected to previous punitive damage awards based upon the same wrongful act</u>: There was no evidence of previous punitive damage awards against LCCA.

8. <u>Whether, once the misconduct became known to defendant, defendant took remedial action or attempted to make amends by offering a prompt and fair settlement for actual harm caused</u>: There was no evidence of settlement discussions but the jury knew that .this was the second time the case had been tried and that the litigation had lasted almost 5 years.

9. <u>Any other circumstances shown by the evidence that bear on determining the proper amount of the punitive award</u>: None.

The Trial Court concluded that "[g]iven the following findings of fact, this Court finds that, in the view most favorable to the Plaintiffs, material evidence exists from which a jury could conclude by clear and convincing evidence that Life Care acted with reckless disregard for the safety of and well-being of Earl McLemore. Upon review of the jury's punitive damage award, it is approved . . . ."

The foregoing established that the Trial Court did conduct the thorough review and make the findings that it was obligated to make under *Hodges*.

C. Did the Trial Court misconstrue Life Care's financial position?

One of the *Hodges* factors a trial court is instructed to consider as part of a *Hodges* review is the defendant's "financial affairs, financial condition, and net worth." Here, the Trial Court stated in its Findings of Fact and Conclusions of Law that the evidence showed that LCCA is a privately owned nursing home chain of more than 200[6] nursing homes with 30,000 residents. The Trial Court further stated that the 2007 tax return of LCCA showed $818,970,355 in gross receipts or sales and total assets of $574,122,999. Appellants claim that the Trial Court misunderstood LCCA's financial condition because the only evidence presented at trial was LCCA's 2007 federal tax return and that "there was no explanation for[sic] any witness why a tax return from 2007 was relevant to injuries that allegedly occurred in 2005 or a trial that occurred in 2009". Appellants argue the Trial Court should have looked beyond LCCA's gross receipts and assets listed on the 2007 tax return to see that LCCA's "ordinary business income for tax purposes, was only $6,850,471" and "its own audited income statement reflected only $2,127,461 in income for that year." Appellants conclude that the Trial Court erred when it considered LCCA's gross receipts that were "at least 119 times – and up to 385 times – Life Care's actual income". Appellants also argue that the asset figure used by the Trial Court of $574,122,999 was offset by debt of

_____

[6] The testimony of LCCA executives was that LCCA had 268 nursing homes at the time of trial.

$469,482,758.

The Trial Court, however, did consider evidence of LCCA's financial condition, other than the 2007 tax return. The Trial Court noted in its *Hodges* review that the LCCA executives testified that LCCA, a privately held company, owned over 200 nursing homes and had 30,000 residents in those nursing homes. That information, together with annual gross receipts of over 800 million dollars and assets of well over 500 million dollars is evidence of significant wealth. The Trial Court noted that Life Care never objected to the entry of the 2007 tax return into evidence. Parties who desire to object to the admission of evidence must make their objection in a timely manner and must state the specific basis for their objection. *In re Estate of Park*, M2003-00604-COA-R3CV, 2005 WL 3059443 at *5 (Tenn. Ct. App. Nov. 14, 2005); *Overstreet v. Shoney's, Inc.,* 4 S.W.3d 694, 702 (Tenn.Ct.App.1999). Failing to make a timely, specific objection in the trial court prevents a litigant from challenging the introduction of the evidence for the first time on appeal. *Woodson v. Porter Brown Limestone Co.,* 916 S.W.2d 896, 907 n. 10 (Tenn. 1996); *Ehrlich v. Weber,* 88 S.W. 188, 189 (1905); *Wright v. United Servs. Auto. Ass'n,* 789 S.W.2d 911, 914 (Tenn. Ct. App.1990).

Moreover, Life Care had waived the right to object to this evidence during a pre-trial proceeding on June 30, 2009. At that hearing Life Care was intent on not producing financial documents sought by plaintiff in discovery unless the jury made a punitive damage award. To that end, as we have previously noted, Life Care's counsel stood before the Trial Court and made the assurance that just one document, a federal tax return from the previous year, would suffice to provide all of the financial information plaintiff would need at the punitive damage stage.

Another problem with Life Care's argument is an attempt to make an end run around its failure to move for a directed verdict. Because there was no motion for a directed verdict, Life Care is precluded from arguing on appeal that there was no material evidence to support the jury's punitive damage award. Moreover, whether this assignment of error would have any merit is not to be considered, however, because defendants failed to raise the issue at the court below, either at trial or in their motion for a new trial. *See, Correll v. E.I. DuPont de Nemours & Co.*, 207 S.W.3d 751, 757 (Tenn. 2006)(citing *Simpson v. Frontier Cmty. Credit Union,* 810 S.W.2d 147, 153 (Tenn.1991)).

D. Did the punitive damage award violate due process?

Appellate courts subject a jury's punitive damage award to searching scrutiny because allowing a jury to award punitive damages "pose[s] an acute danger of [an] arbitrary deprivation of property, [and has] a devastating potential for harm when imposed indiscriminately." *Flax.,* 272 S.W.3d at 532. (citing *Honda Motor Co., Ltd. v. Oberg*, 512 U.S. 415, 432, 114 S. Ct. 2331, 129 L. Ed. 2d 336 (1994); *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 417, 123 S. Ct. 1513, 155 L. Ed. 2d 585 (2003). As our Supreme

Court noted in *Flax*, there is always the "potential that juries will use their verdicts to express biases against big business, especially ones without a strong local presence." *Flax* at * 555 (citing *Oberg*, 512 U.S. at 432). Even though punitive damages are "aimed at deterrence and retribution . . . to the extent an award of punitive damages is grossly excessive, it furthers no legitimate purpose and constitutes an arbitrary deprivation of property." *Goff,* 297 S.W. 3d at 191 (citing *Campbell*, 538 U.S. at 417). Thus, a grossly excessive punitive damage award violate's a defendant's due process right afforded by the Fourteenth Amendment to the United States Constitution. *Goff* at 190.

In *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 116 S. Ct. 1589, 134 L. Ed. 2d 809 (1996) and *Campbell*, 538 U.S. 408, the United States Supreme Court stated that an award of punitive damages beyond certain multiples of the compensatory damages strains the concept of fairness and due process. *LaMore* at * 11(citing *Gore* and *Campbell*). However, in a case which calls for low compensatory awards, the ratio between compensatory and punitive damages may be greater so that the punitive purpose of such damages may be accomplished. *Id*. In making this determination, the United States Supreme Court stated there were three guideposts that must be considered: (1) the degree of reprehensibility of the defendant's conduct; (2) the disparity between the actual and potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded and the civil penalties authorized or imposed in comparable cases. *Goff* at 195. Thus, this Court must examine the facts presented in this case within the context of these three guideposts to determine whether or not the punitive damages awarded by the jury and confirmed by the Trial Court violate Life Care's due process rights.

The United States Supreme Court stated in *Gore* that the degree of reprehensibility of the defendant's conduct was "[p]erhaps the most important indicium of the reasonableness of a punitive damages award . . . ." The Court went on to explain that "exemplary damages imposed on a defendant should reflect "the enormity of his offense" but should not be "wholly disproportioned to the offense", thus reviewing courts "should examine the gravity of the defendant's conduct and the harshness of the award of punitive damages". It stated that [t]his principle reflects the accepted view that some wrongs are more blameworthy than others. *Gore*, 517 U.S. at 575. The *Gore* Court noted that "nonviolent crimes are less serious than crimes marked by violence or the threat of violence"; that "trickery and deceit . . . are more reprehensible than negligence" and that in some cases "the defendant's intentional malice" was the decisive factor in determining reprehensibility. *Gore*, 517 U.S. at 576 (citations omitted).

The United Supreme Court has also stated that when addressing the reprehensible nature of a defendant's conduct the courts should consider:

(1) whether the harm caused was physical as opposed to economic;

(2) whether the tortious conduct evinced an indifference to or a reckless disregard of

-17-

the health or safety of others;

(3) whether the target of the conduct had financial vulnerability;

(4) whether the conduct involved repeated actions or was an isolated incident; and

(5) whether the harm was the result of intentional malice, trickery, or deceit, or mere accident.

*Campbell,* 538 U.S. at 419. *See also Goff,* 297 S.W.3d at 191-92.

Appellants concede that the first indicia of reprehensibility listed in *Campbell* is present. The evidence clearly established that the injuries sustained by Mr. McLemore, the development of a stage IV decubitus ulcer, dehydration and infection, were physical injuries and not economic injuries.

Appellants contend that the second indicia of reprehensibility, that Life Care's actions showed an indifference or reckless disregard of the health and safety of others, was not demonstrated. However, there was ample material evidence presented at trial to the contrary of appellants' position. Numerous witnesses discussed the short staffing of CNAs at LCCE. These witnesses confirmed that because of the short staffing, the CNAs could not deliver the care to Mr. McLemore and other patients with similar needs that they required. There was medical testimony that Mr. McLemore's decubitus ulcer would not have developed to a stage IV if he had received the care he needed. Further, there was testimony that the management of LCCE knew of the short staffing and knew of the insufficiency of care. Life Care, by not correcting its CNA staffing issues, showed reckless indifference to the health and safety of Mr. McLemore and similarly situated patients.

There was no evidence presented that showed that Mr. McLemore was "financially vulnerable" thus the third *Campbell* indicia of reprehensibility is not met here.

Appellants claim that the fourth reprehensibility indicia, that their conduct involved repeated actions incidents and was not an isolated incident was not met. The Sixth Circuit Court of Appeals explained that this factor "require[s] that the similar reprehensible conduct be committed against various different parties rather than repeated reprehensible acts within the single transaction with the plaintiff. " *Bridgeport Music, Inc. v. Justin Combs Pub*, 507 F.3d 470, 487 (6th Cir. 2007)(citing *Chicago Title Ins. Corp. v. Magnuson,* 487 F.3d 985, 1000 (6th Cir.2007) (quoting *Bach v. First Union Nat'l Bank,* 149 Fed.Appx. 354, 356 (6th Cir.2005)). Here, there was material evidence from multiple witnesses that the facility was understaffed with CNAs and that the basic care required by Mr. McLemore and similarly situated patients could not be adequately and consistently delivered due to the understaffing. The testimony covered the care Mr. McLemore received, the care other patients received during the time he was at LCCE, as well as prior to his admission and after his discharge.

There is ample evidence in the record that the understaffing and subsequent inadequate care was not an isolated incident.

Both parties agree the fifth reprehensibility factor, malice, trickery or deceit, was not present in this case. Thus, material evidence of three of the five considerations for reprehensibility listed in *Campbell* were present. We note that the most persuasive evidence of reprehensibility presented by plaintiff was that Mr. McLemore was completely helpless and depended wholly on LCCE's staff for all aspects of his care. LCCE was aware of his total dependence when they accepted him as a patient despite the short staffing of basic caregivers. We hold that there was material evidence that the actions of Life Care were highly reprehensible.

The second guidepost set forth by the United States Supreme Court in *Gore* to assist a court in determining whether a punitive damage award violates a defendant's right to due process is an examination of whether there is disparity between the actual harm suffered by the plaintiff and the punitive damages award. *Gore* 517 U.S. at 575. The Tennessee Supreme Court in *Goff* discussed the application of this guidepost as follows:

> The second guidepost is the "disparity between the harm or potential harm suffered" and the punitive damages awarded. *Gore,* 517 U.S. at 575, 116 S.Ct. 1589. This guidepost reflects the general concern that punitive damages bear a "reasonable relationship" to compensatory damages. *Id.* at 580, 116 S.Ct. 1589. According to the Supreme Court, "the proper inquiry is whether there is a reasonable relationship between the punitive damages award and *the harm likely to result* from the defendant's conduct as well as the harm that actually has occurred." *Id.* at 581, 116 S.Ct. 1589(internal quotation marks and citation omitted). Although the Court has repeatedly refused to "impose a bright-line ratio which a punitive damages award cannot exceed," the Court has also stated that "few awards exceeding a single-digit ratio between punitive and compensatory damages ... will satisfy due process." *Campbell,* 538 U.S. at 425, 123 S.Ct. 1513. *See also Gore,* 517 U.S. at 582–83, 116 S.Ct. 1589 ("Of course, we have consistently rejected the notion that the constitutional line is marked by a simple mathematical formula...."). Moreover, the Supreme Court has made clear that "[t]he precise award in any case, of course, must be based upon the facts and circumstances of the defendant's conduct and the harm to the plaintiff," and that "there are no rigid benchmarks that a punitive damages award may not surpass." *Campbell,* 538 U.S. at 425, 123 S.Ct. 1513. We agree.

> The Supreme Court has acknowledged that "low awards of compensatory damages may properly support a higher ratio than high compensatory awards, if, for example, a particularly egregious act has resulted in only a small amount of economic damages." *Gore,* 517 U.S. at 582, 116 S.Ct. 1589. "A higher ratio may also be justified in cases in which the injury is hard to detect or the monetary value of noneconomic harm might have been difficult to determine." *Id.* However, the Court

-19-

has described as "breathtaking" a 500–to–1 ratio between punitive and compensatory awards. *Id.* at 583, 116 S.Ct. 1589.

*Goff* at 193-94.

Here the punitive damage award of $4.25 million is 18.8 times higher than the remitted compensatory damages award of $225,000. Appellants argue that exceeding a single digit ratio between the compensatory and punitive damage award is not warranted here as "Life Care's actions were far from egregious" and "any harm caused by Mr. McLemore might perhaps have resulted from negligent management, but it did not result from conscious disregard of his wellbeing." In support of this contention, appellants rely on their argument that only one of the *Campbell* reprehensibility factors, physical evidence, was shown at trial. Appellants also point to several cases where a low ratio between compensatory and punitive damage awards were approved. *See ,e.g., Bridgeport Music, Inc.,* 507 F.3d at 487.

Appellants' arguments regarding the second guidepost in the due process analysis for punitive damages are unpersuasive. First, appellants' statement that "Life Care's actions were far from egregious" and "any harm caused by Mr. McLemore might perhaps have resulted from negligent management, but it did not result from conscious disregard of his wellbeing" is not established in the record and is contrary to the jury's specific finding of recklessness. The jury found the evidence showed that Life Care's actions or inactions toward Mr. McLemore were "reckless". The jury was instructed, pursuant to *Hodges*, that reckless means that a "person is aware of, but consciously disregards; a substantial and unjustifiable risk of such a nature that its disregard constitutes a gross deviation form the standard of care that an ordinary person would exercise under all the circumstances." The jury's findings contradicts Life Care's statement, in that it found that the injury to Mr. McLemore was a result of Life Care's conscious disregard for his wellbeing. Moreover, as we have pointed out, Life Care waived any right to challenge the jury's finding of recklessness when it failed to make a motion for a directed verdict.

Further, the cases cited by appellants are likewise unpersuasive on this issue. *Bridgeport Music, Bach* and *Clark* all based the low ratio between compensatory and punitive damages on the fact that only one factor of reprehensibility was identified and in each case the Court found that the amount of compensatory damages was substantial. In *Boerner v. Brown and Williamson Tobacco Co.,* 394 F.3 594, 603 (8th Cir. 2005) the appellate court remitted the punitive damage award form $15 million to $5 million because the compensatory damage award for loss of plaintiff's life was $4,025,000. The court concluded that although the defendant's acts were "highly reprehensible", in view of large compensatory damage award, "a ratio of approximately 1:1 would comport with the requirements of due process."

Here, in this case three of the five reprehensibility factors are present and this Court has concluded that Life Care was "highly" reprehensible. The United States Supreme Court

stated in *Gore* that significantly high multipliers do not offend due process where "a particularly egregious act has resulted in only a small amount of economic damages." *Gore*, 517 U.S. at 582. Tennessee courts have followed *Gore's* guidance and awarded punitive damages based on multipliers exceeding single digits when the defendant's action are found to be egregious and the economic harm is low.

Two fairly recent cases provide examples of a court finding that a significantly high multiplier does not offend due process. *See, Goff* and *LaMore*. The disparity between the compensatory and punitive damages awards here is consistent with *Goff* and *LaMore* and the multiplier does not offend due process considering the egregiousness of the conduct and the low compensatory award.

The third guidepost set forth by the United States Supreme Court in *Gore* to assist a court in determining whether a punitive damage award violates a defendant's right to due process is consideration of the difference between the punitive damages awarded and the civil penalties authorized or imposed in comparable cases. *Gore*, at 583. The Tennessee Supreme Court, in *Goff*, addressed the last guidepost issue as follows:

> The [United States] Supreme Court has instructed that in determining whether the award is excessive, courts should give " ' "substantial deference" ' to legislative judgments concerning appropriate sanctions for the conduct at issue.' " [*Gore*] [] at 583, 116 S.Ct. 1589 (quoting *Browning–Ferris Indus. of Vt., Inc. v. Kelco Disposal, Inc.,* 492 U.S. 257, 301, 109 S.Ct. 2909, 106 L.Ed.2d 219 (1989) (O'Connor, J., concurring in part and dissenting in part)). Penalties that could be imposed for similar conduct "are relevant because they provide defendants with notice of the severity of the penalty that may be imposed upon them." *Flax,* 272 S.W.3d at 537. We also note that at least one court has observed that "when the punitive damages are compared to the civil or criminal penalties that could be imposed for comparable conduct, the ratio of punitive damages to compensatory damages becomes less significant." *Bronakowski v. Lindhurst,* [324] S.W.3d 719,[730] (Ark. Ct. App.2009).

*Goff* at 195 - 196.

Appellants list several state and federal statutes and regulations that might apply to a nursing home that provides insufficient staff to attend to the basic needs of patients. The Tennessee General Assembly has created a statutory scheme governing nursing homes, the Nursing Home Compassion, Accountability, Respect and Enforcement Reform Act, Tenn. Code Ann. §§ 68-11-801 *et seq.* (the Nursing Home Act). The Nursing Home Act provides for civil penalties to be assessed against nursing homes that violate applicable standards of conduct. Tenn. Code Ann. § 68-11-801 (a) provides the commissioner of health with the authority to impose civil monetary penalties upon deficient nursing homes, as defined by § 68-11-201, under the circumstances provided in the statute. Tenn. Code Ann. § 68-11-801 (b) provides the commissioner with authority to impose civil monetary penalties in such

amount, scope, manner and circumstances as required by the federal Nursing Home Reform Act of 1987. Tenn. Code Ann. § 68-11-801 (d) states that the imposition of a state civil penalty pursuant to this section and the decision to impose such penalty shall not be affected by either the imposition or withholding of a federal sanction under Title XVIII, compiled in 42 U.S.C. § 1395 *et seq*., or Title XIX, compiled in 42 U.S.C. § 1396 *et seq*., of the Social Security Act.

Appellants argue that under the Tennessee Nursing Home Act a nursing home could be assessed a maximum penalty of $1,500 for failure to reposition bed and chair bound patients every two hours pursuant to Tenn. Code Ann. § 68-11-803(c)(1). They further state that a nursing home could also be assessed a maximum penalty of $1,500 for failure to bathe and clean incontinent patients each time they are soiled under Tenn. Code Ann. §68-11-803(c)(2). Appellants reason that, assuming these statutes apply to Mr. McLemore's care at LCCE and that LCCE was fined for violation of the statutes once per day during Mr. McLemore's thirteen day stay at LCCE, the fine would total $39,000. Additionally, Tenn. Code Ann. § 68-11-802(a) provides for a penalty of up to $7,500 if the conditions in a nursing home are, or are likely to be, detrimental to the health, safety or welfare of the patients. According to appellants, if this statute applied here and Life care was found to be in violation of it, the penalty for the period of Mr. McLemore's stay at LCCE would be $97,000.

Appellants also point to federal law that provide for penalties of up to $10,000 per occurrence if a violation of certain requirements places the nursing home patient in"immediate jeopardy to . . . health or safety. *See* 42 U.S.C. § 1395i-3; 42 C.F.R. §§ 483.1 *et seq*.; 42 C.F.R. § 488.408(e)(2)(ii); 42 C.F.R. § 488.438(a)(1)(I); *Claiborne-Hughes Health Ctr. v. Sebelius*, 609 F.3d 839, 842 (6th Cir. 2010), reh'g denied (Aug. 20, 2010). Appellants state that assuming this federal regulatory scheme applied here and that Life Care was found to be in violation of it and assessed the penalty for each of the thirteen days of Mr. McLemore's stay, the total amount of the fine would be $130,000. Thus, if all three sets of penalties discussed in appellants' brief were assessed against Life Care, the total would be $266,500, significantly less than the punitive damage award of $4.25 million.

Appellants neglected to discuss Tenn. Code Ann. § 68-11-207, which provides that a nursing home's license can be suspended or revoked for "conduct or practice found by the board to be detrimental to the welfare of the patients". Thus, the State of Tennessee has the power to revoke Life Care's license to operate LCCE upon a finding that its understaffing was detrimental to Mr. McLemore's welfare. The monetary impact of the loss of such license is not a part of the record, however, and this Court can assume that it would be significantly higher than $266,500, the potential penalties tallied by appellants, and much closer to the punitive damage award.

We concluded that the punitive damage award did not offend due process under the first two guideposts provided in *Gore*, and we need not speculate as to the potential civil

penalties that could be assessed against Life Care. The Tennessee Supreme Court, in *Flax*, conducted a *Gore* due process analysis of a punitive damage award, and concluded that under the first two guideposts a ratio of 1 to 5.35 was appropriate and that defendant's highly reprehensible conduct warranted such an award without violating due process. *Flax* at 539. However, the Court found that the third guidepost set forth in *Gore* compelled a different conclusion because "the statute that most closely expresses the Tennessee General Assembly's judgment concerning the wrongfulness of [defendant's] conduct is the reckless homicide statute", Tenn. Code Ann. 39–13–215, which carried a maximum statutory punishment for corporations of $125,000. *Id*. The Supreme Court considered its dilemma as follows:

> Pursuant to the holding of the United States Supreme Court, we must accord "substantial deference" to the General Assembly's decision that $125,000 is an appropriate sanction against corporations guilty of reckless homicide. *Gore,* 517 U.S. at 583, 116 S.Ct. 1589. Furthermore, we must "avoid use of the civil process to assess criminal penalties that can be imposed only after the heightened protections of a criminal trial have been observed." *Campbell,* 538 U.S. at 428, 123 S.Ct. 1513. Although the United States Supreme Court has never held that the third guidepost is dispositive, it appears that under this guidepost $125,000 would be the maximum punitive damage award that could be imposed in this case. Arguably, this is because [] [defendant] never had notice that it could be held liable for an amount greater than $125,000. Clearly, the result recommended by the third guidepost is dramatically at odds with the result suggested by the first two. We are unfortunately left with little guidance as to how to resolve this discrepancy because both *Gore* and *Campbell* are cases in which all of the guideposts suggest the same result. Other courts have experienced similar frustrations when attempting to apply the third guidepost, and some have chosen to ignore the third guidepost altogether. *See, e.g., In re EXXON VALDEZ,* 490 F.3d 1066, 1094 (9th Cir.2007) (noting that if the Court of Appeals for the Ninth Circuit mentions the third guidepost at all, it does not review the amounts of legislative penalties but determines "whether or not the misconduct was dealt with seriously under state civil or criminal laws"); *Willow Inn, Inc. v. Pub. Serv. Mut. Ins. Co.,* 399 F.3d 224, 237–38 (3d Cir.2005) (noting the difficulty courts have in applying the third guidepost and declining to overturn a punitive damage award on that basis alone).

> Although we are somewhat unsure how to reconcile the third guidepost with the first two, we are inclined to give the first two guideposts considerably more weight. The United States Supreme Court has held that the first guidepost is the most important and has never stated that the third guidepost is dispositive. Furthermore, we are unaware of any state or federal case that has invalidated a punitive damage award solely because the award was greater than that contemplated by statutory penalties. In addition, the trial court's award in this case is far less drastic than the awards rejected in *Gore* and *Campbell,* which were 1,000 and 14,500 times greater,

-23-

respectively, than the maximum civil or criminal penalty. *See Campbell,* 538 U.S. at 428, 123 S.Ct. 1513; *Gore,* 517 U.S. at 584, 116 S.Ct. 1589. Finally, we do not believe that a punitive damage award of $125,000 would adequately punish [defendant] or deter future instances of similar conduct. For these reasons, we conclude that a punitive damage award of $13,367,345 is constitutionally permissible in this case.

*Flax* at 539 - 504.

Guided by the teaching in *Flax*, this Court is inclined to give more weight to the first two guideposts than the third, as the possible civil penalties discussed by the parties on appeal are speculative, especially as to the monetary cost to Life Care if LCCE's license were revoked. *Gore* clearly stated that the first guidepost regarding reprehensibility is the most important. Since we find that Life Care's actions were highly reprehensible, we conclude that the punitive damage award of $4.25 million does not offend due process. Moreover, as discussed in *Flax*, a punitive damage award of $266,500, the amount of civil penalties tallied by appellants, would not adequately punish Life Care or deter future instances of similar conduct. For these reasons, we hold that the punitive damage award of $4.25 million is constitutionally permissible in this case.

> E.    Were the Trial Court's jury instructions erroneous because they incorporated an inapplicable standard of care based on a medical malpractice claim rather than a negligence claim?

The next issue for this Court to consider is whether the Trial Court erred when it instructed the jury on medical malpractice instead of giving a charge on ordinary negligence. Appellants argue that because the entire $4.475 million damage award was based entirely on the cause of action of medical malpractice, which is inapplicable, the Trial Court's judgment should be reversed and remanded for a new trial. As we have noted prior to trial, defendant and appellants filed a motion for partial summary judgment on the pleadings, asking the Trial Court to dismiss the claims based on ordinary negligence, gross negligence, negligence *per se*, the Tennessee Adult Protection Act, the Tennessee Consumer Protection Act and misrepresentation. But the Trial Court denied defendants' motion regarding the negligence claim, and after the plaintiff withdrew the negligence claim, the Trial Court instructed the jury on medical malpractice only. Following entry of Judgment in this case, the Supreme Court issued its opinion in *Estate of French v. Stratford House*, 333 S. W. 3d 540 (Tenn. 2011). The facts in *Estate of French* are similar to the facts in this case. The Supreme Court in *French* observed that because medical malpractice is a type of negligence, the distinction between medical malpractice and negligence claims is subtle; there is no rigid analytical line separating the two causes of action. *Id.* at 555. The Court stated that "the distinguishing feature between ordinary negligence and medical malpractice cases is whether a plaintiff's claim is for injuries resulting from negligent medical treatment." *Id.* at 555. The Court noted that in *Gunter* it had adopted the standard employed by the New York courts for

distinguishing an ordinary negligence claim from one based upon medical malpractice as follows:

> [W]hen a claim alleges negligent conduct which constitutes or bears a substantial relationship to the rendition of medical treatment by a medical professional, the medical malpractice statute is applicable. Conversely, when the conduct alleged is not substantially related to the rendition of medical treatment by a medical professional, the medical malpractice statute does not apply.

*Estate of French*, 3d at 555. The Court offered further clarification as to the difference between the two causes of action: "The physician-patient relationship is an essential element of a cause of action for medical malpractice, but not for common law negligence." *Id.* at 555. The Court cautioned, however that "[n]ot all cases involving health or medical care automatically qualify as medical malpractice claims ordinary negligence liability to non-patients may be applicable to physicians under ordinary negligence principles.

> The Supreme Court summarized its holding on this issue as follows:
> In summary, not all care given to patients at nursing home facilities is necessarily related to the rendering of medical care by a medical professional. The assessment of a patient's condition and the development of a plan of care that determines how often and when a patient needs to be fed, hydrated, bathed, turned, or repositioned may require specialized medical skills, and thus should proceed under the TMMA. A nursing home's failure to ensure that its staff, including certified nursing assistants, actually complies with the plan of care and performs services that, however necessary, are routine and nonmedical in nature, falls into the category of ordinary negligence. Because this complaint and the supporting evidence suggests that both types of claims are present, summary judgment on the ordinary negligence claim is not appropriate. On remand, the trial court shall submit both causes of action to the jury for its consideration and instruct the jury accordingly.

*Id.* at 560.

Plaintiff/appellee does not take issue with the holding in *Estate of French*, that allegations of understaffing in a nursing home sound in negligence. But appellee does take issue with appellants raising this issue on appeal for the first time. Appellee claims that appellants cannot complain on appeal about the jury charge because it was appellants who insisted that this was a medical malpractice case from the inception of the litigation, referring to appellants' pre-trial motion to dismiss the negligence claims months before trial.

Further, appellee also argues that appellants are not entitled to relief on the jury instruction because they did not object to the medical malpractice jury instruction in the court below. Tenn. R. Civ. P. 51.02 provides that a party may seek a new trial based on an inaccurate jury instruction, even if it did not object to the instruction at trial. Appellants did

not raise the issue at trial or in their motion for a new trial. It is well settled that issues not raised in the trial court generally should not be raised for the first time on appeal. *Correll v. E.I. DuPont de Nemours & Co.,* 207 S.W.3d 751, 757 (Tenn., 2006). However, Tenn. R. App. P. 13(b) and 36(a) give appellate courts considerable discretion to consider issues that have not been properly presented in order to achieve fairness and justice. *Heatherly v. Merrimack Mut. Fire Ins. Co.*, 43 S.W.3d 911, 916 (Tenn. Ct. App. 2000)(citing *Aaron v. Aaron,* 909 S.W.2d 408, 412 (Tenn.1995)). When considered together, these rules allow appellate courts to grant relief to the parties as long as they have been given fair notice and an opportunity to be heard on the dispositive issues. *Heatherly* at 916. Tenn. R. App. P. 13 (b) provides that generally this Court will only consider issues presented by the litigants for review. However, Rule 13 (b) requires an appellate court to consider whether the trial and appellate court have jurisdiction over the subject matter, whether or not presented for review. The rule also provides that an appellate court may, in its discretion, consider other issues in order, among other reasons: (1) to prevent needless litigation, (2) to prevent injury to the interests of the public, and (3) to prevent prejudice to the judicial process. Tenn. R. App. P. 36 **(**a) provides for the relief an appellate court must grant and the relief it may provide:

> The Supreme Court, Court of Appeals, and Court of Criminal Appeals shall grant the relief on the law and facts to which the party is entitled or the proceeding otherwise requires and may grant any relief, including the giving of any judgment and making of any order; provided, however, relief may not be granted in contravention of the province of the trier of fact. Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error.

Tenn. R. App. P. 13 (b) and 36 (a) give this Court the discretion to consider the issue of whether the Trial Court's jury instruction on medical malpractice was error, although not raised on appeal below, but Rule 36 (a) states that a Court is not required to grant relief to a party who "invited error, waived an error, or failed to take whatever steps were reasonably available to cure an error."

The issue thus becomes whether this Court's consideration of appellant's issue of the inaccurate jury charge may prevent needless litigation, prevent injury to the public, prevent prejudice to judicial process or prevent some other compelling outcome? First, for this Court to hold the Trial Court erred when it instructed the jury on medical malpractice alone and to reverse the verdict and remand for a new trial would actually cause more litigation, but the new trial would not be "needless" litigation.

As to the other two parts, public policy and the integrity of the judicial process are to be considered. Denying a new trial would not prevent injury to the interest of the public, since the Supreme Court has clearly set forth the law in this area in the *Estate of French,* which will guide future court decisions in the public's interest. As to the issue of preventing prejudice to the judicial process, we are not required to grant leave to a party who invited

error or waived error. *See,* Tenn. R. App. P. 36(a). We decline to raise this issue on our own motion.

F.     Did the Trial Court err when it denied defendant's motion for a new trial?

Appellants' next issue on appeal is whether the Trial Court erred when it denied Life Care's Motion for a new trial. Life Care argues the Trial Court "abdicated its role as thirteenth juror" when it denied the motion for a new trial. This Court's standard of review of a trial court's denial of a motion of new trial is limited to a determination of whether there is any material evidence to support a jury verdict. This standard, however, is not applicable unless the trial judge has fulfilled his duty as a "thirteenth juror." The trial judge is the thirteenth juror and no verdict is valid until approved by the trial judge. A trial court's decision regarding whether to grant or deny a motion for a new trial is discretionary in nature, and this Court reviews such rulings with great deference. We will only disturb such a decision if it amounts to an abuse of discretion. *Ali v. Fisher*, 145 S.W.3d 557, 564-65 (Tenn. 2004); *565 Henry v. Goins,* 104 S.W.3d 475, 479 (Tenn.2003).

Appellants' first complaint is that, in their opinion, the Judge abandoned its role of thirteenth juror because it was pre-disposed to sustaining the jury's verdict. Life Care had made the motion for a mistrial, as we have previously noted, after the Trial Judge gave a curative jury instruction that Life Care itself had requested. The Trial Court denied Life Care's motion for a mistrial and in what appears in the transcript to be an "off-handed" remark said " [i]f there is another trial ordered, I won't try it, I'll guarantee you. I have done it twice." The transcript reflects that this remark was followed by laughter in the courtroom. Appellants claim this remark is evidence that " a new trial was never an option.

We reject appellants' argument because the Trial Court's comment was made in response to Life Care's motion for a mistrial and not in response to its motion for a new trial. The motion for a mistrial had no merit and the Trial Court's denial had nothing to do with its role as thirteenth juror. Additionally, the Trial Court's remark about not trying the case again was apparently off-hand and taken as humorous by the people present in the courtroom.

Appellants further argue that the Trial Court's suggestion of remittitur of the compensatory damages shows that it was dissatisfied with the jury verdict. The Trial Court suggested a remittitur of compensatory damages from $500,000 to $225,000 based on its finding that Mr. McLemore was already very ill when he was admitted to LCCE and that "his life expectancy was certainly limited."

The Trial Court did not abuse its discretion when it denied the motion for new trial. All of the Trial Court's comments regarding the jury's verdict had to do with the amount of the compensatory damages. The Trial Court, as demonstrated by its *Hodges* review, did not disagree with the jury's findings. Based on the record, the Trial Court's disagreement with the jury's verdict was only as to the amount of the compensatory damage award. Remittitur

or an order for a new trial are both appropriate options when a trial court disagrees with a damage award. These options were addressed in *Palanki ex rel. Palanki v. Vanderbilt Univ.*, 215 S.W.3d 380 (Tenn. Ct. App. 2006). Here, the Trial Court did not abuse its discretion when it suggested remittitur instead of ordering a new trial. The case had been tried twice and the suggested remittitur spared the expense of another lengthy trial. The Trial Court made it clear that its disagreement with the jury's verdict was only as to the amount of compensatory damages awarded, and the Court's reasoning was based on material evidence in the record regarding the severity of Mr. McLemore's condition when he was admitted to LCCE. The Trial Court did not err when it suggested a remittitur instead of granting Life Care's motion for a new trial.

G. Were the defendants deprived of their right to a jury trial when the Trial Court suggested a remittitur of compensatory damages but sustained the punitive damages award?

Appellants' final issue is that the defendants were deprived of their right to a jury trial when the Trial Court suggested a remittitur of compensatory damages, but sustained the punitive damages award. This issue was not raised in the court below and we will not consider it on appeal. *See Barnes v. Barnes*, 193 S.W.3d 495, 501 (Tenn. 2006).

H. Did the Trial Court err when it suggested remittitur of compensatory damages?

Finally, plaintiff /appellee raises the issue of whether the Trial Court was in error when it suggested a remittitur of compensatory damages? This Court reviews a trial court's determination of a remittitur *de novo* upon the record with a presumption of correctness of the trial court's findings unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(3); Tenn. Code Ann. § 20-10-102(b). *Also see, Palanki*, 215 S.W.3d 380 (citing, *Long v. Mattingly,* 797 S.W.2d 889, 896 (Tenn. Ct. App. 1990).

Here, the Trial Court stated its reasons for disagreeing with the jury's compensatory damage award. We hold that the evidence does not preponderate against the Trial Court's suggested remittitur of the compensatory damages, and affirm the Trial Court's suggestion of remittitur.

We affirm the Judgment of the Trial Court and remand, with the cost of the appeal assessed to defendants/appellants.

_____
HERSCHEL PICKENS FRANKS, P.J.