IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
May 2, 2023 Session

## AUDREY KORSHOFF ET AL. v. WESLEY FINANCIAL GROUP, LLC

Appeal from the Circuit Court for Williamson County
No. 2020-CV-2    Deanna B. Johnson, Judge
_____

### No. M2022-00630-COA-R3-CV
_____

An employer terminated an employee after she requested unpaid commissions pursuant to her contract. The employee sued her former employer claiming breach of contract, unjust enrichment, retaliatory discharge, and intentional misrepresentation. She also sought punitive damages. The jury found in the employee's favor on all claims and awarded damages for breach of contract, unjust enrichment, and retaliatory discharge as well as awarding punitive damages. The former employer sought post-trial relief, arguing the jury's verdicts were inconsistent and that the jury's punitive damages award was in error and excessive. The trial court concluded the verdicts were consistent but did reduce, while not eliminating, the punitive damages award. The former employer appeals, challenging the compensatory and punitive damage awards. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

JEFFREY USMAN, J., delivered the opinion of the Court, in which ANDY D. BENNETT and W. NEAL MCBRAYER, JJ., joined.

Aubrey B. Harwell, Jr., James G. Thomas, and John E. Quinn, Nashville, Tennessee, for the appellant, Wesley Financial Group, LLC.

Robert E. Boston, Quynh-Anh D. Kibler, and David J. Zeitlin, Nashville, Tennessee, for the appellees, Audrey Korshoff and M.K.

## OPINION

America's timeshare industry, which is built upon selling individuals and families "split ownership" of vacation homes "for a given length of time every year, in perpetuity,"

has grown substantially.[1]  In response to the "85 percent of timeshare owners who . . . regret their purchase," industrious companies have begun marketing timeshare cancellation services, promising customers to send negotiators to fight to cancel their timeshare.[2]  Appellant Wesley Financial Group (Wesley) provides such timeshare cancellation services.  This appeal concerns Wesley's termination of one of its employees, Appellee Audrey Korshoff.

Ms. Korshoff had a successful marketing career.  She worked for Wyndham Worldwide, a timeshare sales company, before meeting Chuck McDowell, Wesley's Chief Executive Officer.  In the summer of 2018, Ms. Korshoff suggested to Mr. McDowell that she might be interested in leaving Wyndham Worldwide to work at Wesley in a sales-based role.  Mr. McDowell welcomed the idea and urged Ms. Korshoff to contact Robin McVey, the company's Chief Operations Officer.  Ms. Korshoff met Ms. McVey soon thereafter to discuss her interest in working at the company.  She explained during this initial meeting that she sought a position that could "be paid [at a rate of] $120,000 salary plus commissions."[3]  Ms. McVey told Ms. Korshoff that she "could 'get there quickly'" but would first have to spend some time working in a training role.  Ms. Korshoff agreed to work for Wesley initially in a role as a Qualification Specialist in July of 2018.  This role provided Ms. Korshoff with an opportunity to familiarize herself with Wesley's staff and internal processes while earning $12 per hour in compensation.

After just three weeks of working in that role, Ms. Korshoff was named "Director of Business Development."  Ms. Korshoff testified that this was a "new role at the company" that was created specifically for her.  The parties agreed to a new compensation scheme.  Ms. Korshoff began earning a salary of $50,000 per year.  In addition to her salary, the company agreed to pay Ms. Korshoff "$250 in commission on (1) any deal that closed that she had either called personally and set up an appointment for or (2) for any deal that closed that was directly attributable to any of the leads she brought in under her new position, whether she had set the appointment or not."

---

[1] Megan Cerullo, *Timeshares: Everything you need to know before buying in*, CBS News (Mar. 30, 2023), https://www.cbsnews.com/news/what-is-a-timeshare-cbs-news-explains/.

[2] Christopher Elliott, *Trapped in a timeshare? Here's how to escape*, USA Today (Dec. 26, 2018), https://www.usatoday.com/story/travel/advice/2018/12/26/timeshare-troubles-extricate-unwanted-unit/2375107002/

[3] The record on appeal contains no transcript of the evidence.  Instead, Wesley sought to meet its obligations under Tennessee Rule of Appellate Procedure 24(c) by proposing its own statement of the evidence.  Ms. Korshoff objected, arguing Wesley's submission was "rife with verifiably inaccurate statements of fact" and would not "provid[e] 'a fair, accurate, and complete account of what transpired.'"  Tenn. R. App. P. 24(c).  She also proposed an alternative Rule 24 statement of the evidence.  The trial court entered a memorandum and order agreeing with Ms. Korshoff, stating "Defendant's *Proposed Statement of the Evidence* utterly fails to 'convey a fair, accurate, and complete account of what transpired.'"  Accordingly, the trial court accepted Ms. Korshoff's statement and rejected Wesley's statement.

Ms. Korshoff usually earned commissions through one of three different routes. First, Ms. Korshoff personally organized trade shows and other public events where individuals could be solicited for the purpose of cancelling their timeshare agreements. Ms. Korshoff testified that she personally "planned, oversaw, and worked" these public events. Second, she "built and integrated the Referral Rock program to track and encourage more leads." According to Ms. Korshoff, the Referral Rock program was essentially a referral service, garnering both "B2B (business to business) referrals and B2C (business to customer) referrals." Third and finally, Ms. Korshoff also instituted written advertising campaigns. The most notable written advertising campaign that Ms. Korshoff worked on during her time at Wesley was with the American Association of Retired Persons (AARP). She personally oversaw the creation of an advertising campaign with the AARP that began in November of 2018.

While her business development efforts remained in the formative stage, Ms. Korshoff approached the company about her financial condition. Though she anticipated that her efforts would eventually generate significant commissions, Ms. Korshoff, who had been aiming at a $120,000 salary plus commissions, explained that her $50,000 per year salary was not enough to support her family as a single mother. At trial, she testified that Mr. McDowell responded by raising her annual salary to $75,000 per year in September 2018 while leaving her commission payment structure untouched. Ms. Korshoff repeatedly addressed with Mr. McDowell and Ms. McVey her precarious financial situation.

Though the AARP advertisements initially generated "a slow trickle of business" when they were mailed out at the end of November, Wesley's sales increased exponentially at the beginning of 2019. The growth was so significant that Wesley struggled to manage it. The company asked Ms. Korshoff if she would "take a 'pause' for 60 to 90 days on her business development efforts . . . [since] the company was already struggling to keep up with the huge amount of AARP leads and needed some time to make sure [Wesley] could handle the client load . . . [by] hiring more staff." Ms. Korshoff agreed to the pause, declined any invitations from third parties to host additional trade shows beyond those that had already been scheduled, and ceased outreach related to new written advertising campaigns, though she continued carrying out her existing obligations. At approximately the same time, Wesley sent Ms. Korshoff a check for $3,250 on January 25, 2019, representing all commissions she accrued up to that point.

In March 2019, Ms. Korshoff drafted an invoice to account for the commissions she believed she had accrued during the company-initiated pause. According to her accounting, the company owed Ms. Korshoff $35,250 worth of commissions for sales attributable to her efforts that took place between January 22, 2019, and March 26, 2019. Ms. Korshoff testified at trial that senior management "avoid[ed] the conversation" after she submitted her invoice until she was suddenly "pulled into [Mr.] McDowell's office" for a meeting with several of her colleagues. At this meeting she was "yelled at and

belittled . . . for sending the invoice." After the meeting, instead of backing down, Ms. Korshoff continued to update her invoice. According to Ms. Korshoff's updated calculations, Wesley owed her $60,000 in unpaid commissions for sales attributable to her that took place between January 22, 2019, and April 30, 2019. Caustic communications continued from Wesley. Mr. McDowell stated in an email, "[n]obody with a brain would think it's fair to pay you to do nothing."[4] Ms. Korshoff objected to Mr. McDowell's characterization, considering she had not received a single complaint or reprimand, and reminded the company of its agreement to pay her commissions based on closed leads.

Ms. Korshoff offered to revise the commission arrangement if it had become uneconomical or, in the alternative, to train her replacement if the company followed through on its promise by honoring her updated invoice. Mr. McDowell declined either option. Mr. McDowell instead inquired about Ms. Korshoff's attendance habits. Wesley ultimately tendered Ms. Korshoff a separation notice dated May 1, 2019, that stated she "was fired based on 'attendance' issues" and that "listed her as a 'Qualification Specialist' even though her title was Director of Business Development." The record indicates that Wesley did not pay Ms. Korshoff any additional commissions as part of her separation or at any time thereafter.

Ms. Korshoff filed a complaint against Wesley in Williamson County Circuit Court on January 2, 2020. In it, she pleaded four causes of action: breach of contract, unjust enrichment, intentional misrepresentation, and retaliatory discharge. She also sought punitive damages. Ms. Korshoff did not in her complaint describe her breach of contract and unjust enrichment claims as "alternative" grounds for relief. Ms. Korshoff noted that her employment contract with Wesley was an oral agreement, but that the company had initially honored its terms in January 2019. Ms. Korshoff's minor daughter also brought claims against Wesley in the trial court based on the company's refusal to compensate her for working several trade shows.

On September 9, 2021, Ms. Korshoff submitted a Proposed Joint Pre-Trial Statement.[5] She explained her theory of the case in that statement in part as follows: "Defendant breached its agreement with [Ms. Korshoff] and Defendant has been unjustly enriched by [Ms. Korshoff's] work." Here, as in the complaint, Ms. Korshoff did not

---

[4] April Poynter, Wesley's former "Chief People Officer," testified on cross examination that "[s]he was not surprised to hear" Mr. McDowell use the phrase "'anyone with half a brain' towards [Ms. Korshoff]," stating, "[T]hat was the culture at the company."

[5] Though Ms. Korshoff attempted to collaborate with Wesley, the company did not assist in the preparation of this document nor did it submit its own pre-trial statement. Instead, Wesley later provided the trial court with an "Addendum to the Proposed Pre-trial Statement" in which it articulated its position. According to this document, Wesley contended that "[a]t no time were the parties operating under a 'contract' and [Ms. Korshoff] has no proof of the same."

classify these two claims as "alternative" grounds for relief. Ms. Korshoff also identified various categories of damages she sought, including:

> the money [Ms. Korshoff and her daughter were] long owed, their consequential damages from Defendants' failure to live up to their word and wrongful termination of [Ms. Korshoff] (including but not limited to commission payments and salary [Ms. Korshoff] would have earned had she not been wrongfully fired and payments to make up for Plaintiffs' loss [of] their home), and their punitive damages to punish and deter Defendant from engaging in similar conduct in the future.

The trial court held a final hearing in this case on September 16-17, 2021. Ms. Korshoff testified at length. She further updated and quantified her missing commissions, claiming that she had personally identified 258 pre-termination and 1,897 post-termination deals that were directly attributable to her advertising and sales efforts. Based on her calculations, Ms. Korshoff estimated that the company owed her $60,000 in pre-termination commissions and $474,000 in post-termination commissions.[6] Ms. Korshoff testified that the company's annual revenue increased from approximately $28.5 million in 2018, the year she was hired, to approximately $104.4 million in 2020, the year she filed her lawsuit. Ms. Korshoff also entered into evidence "a copy of a 2016 class action complaint filed in the United States District Court for the Middle District of Tennessee against [Wesley]" by former employees who alleged the company violated numerous state and federal statutes, including the Fair Labor Standards Act, by withholding earned wages.

A Williamson County jury found in favor of Ms. Korshoff on all four of her causes of action. Regarding her breach of contract claim, the jury specifically found that "there [was] a contract" between Ms. Korshoff and Wesley, that Wesley breached its contract, and that Ms. Korshoff should be awarded $60,000 in "Unpaid commission damages." Although the jury verdict form does not state that these were Ms. Korshoff's pre-termination commissions, the jury awarded the same amount in unpaid commissions on this claim that Ms. Korshoff testified accrued before her termination. Concerning Ms. Korshoff's unjust enrichment claim, the jury specifically concluded that Ms. Korshoff "prove[d] by a preponderance of the evidence all of the elements of her claim" and found Wesley liable for $201,000. Unlike the breach of contract verdict, these damages are not explicitly defined to be based on unpaid commissions, and this number represents

---

[6] Mr. McDowell did not attend the final hearing in this case. Neither did Ms. McVey, the company's Chief Operations Officer. Though Mr. Chuck McDowell's son Mr. Charles McDowell testified, he did not address the merits of Ms. Korshoff's calculations. Rather, he disputed the premise of her allegations, *i.e.*, that there was such a commission-based payment structure in place. On cross-examination, he emphasized, "no one else at [Wesley] had the commission structure of the type that Audrey Korshoff claimed she was granted. [Wesley] would have owed Audrey Korshoff between $6 million and $30 million on AARP if Audrey Korshoff's commission structure were true." He then asked, "what business person would do that?"

approximately 42% of the post-termination commissions she claimed in her trial testimony. Moving to her retaliatory discharge claim, the jury also concluded that Ms. Korshoff proved all of the elements and awarded her $18,750. In doing so, the jury specified this award was for "[o]ther compensatory damages" and was not based upon "[h]er claim for unpaid commission damages." Finally, the jury also found Wesley liable for Ms. Korshoff's intentional misrepresentation claim but awarded her no further compensation on that basis.

Additionally, the jury awarded Ms. Korshoff $7.5 million in punitive damages. The trial court immediately conducted a separate hearing on the appropriateness of the jury's punitive damages award, pursuant to Tennessee Code Annotated section 29-39-104(a). The jury reaffirmed its punitive damages assessment after further deliberations.

After the trial, Ms. Korshoff submitted a Proposed Final Judgment on Jury Verdict to the trial court, which it ultimately signed on November 10, 2021. The final judgment reflects the jury's verdicts on each cause of action raised in her complaint. It also provides findings of fact and conclusions of law assessing punitive damages. Specifically, the final judgment devotes separate paragraphs to each of the nine factors identified as relevant for consideration in a punitive damages case.

Regarding the first factor, *i.e.*, the Defendant's net worth and financial condition, the trial court noted that Wesley's annual revenue now exceeds $100 million. Addressing the second factor, the objectionable nature of the Defendant's wrongdoing, the trial court observed that the attendance excuse used to fire Ms. Korshoff was mere pretext. Concerning the third factor, whether the defendant was aware of the harm it caused and its motivations, the trial court observed that Wesley "knew from early conversations . . . that she was a single mother who was looking to refinance her home" and that it "was motivated by its motive of retaining all of the profit attributable to" Ms. Korshoff. On the fourth factor, the duration of and efforts to conceal the Defendant's misconduct, the trial court recounted Mr. McDowell's efforts to withhold Ms. Korshoff's commissions by raising unreasonable questions about her attendance despite "admit[ing] in its interrogatories and through Mr. Charles McDowell . . . on cross-examination, that [Wesley] never wrote [Ms. Korshoff] up for any infraction, let alone for any 'attendance'" issues. The trial court stated that no proof was presented at trial relevant to the fifth factor, the amount of money that the Plaintiffs spent to recover from their losses. Regarding the sixth factor, the Defendant's profit from its misconduct and the potential for punitive damages to deter future misconduct, the trial court reiterated that trial testimony proved that the company's annual revenues increased by at least a factor of four during the time Ms. Korshoff worked for Wesley and wrote that the company continues to benefit from "the stream of customers generated from her work." For the seventh factor, other comparable punitive damages awards, the trial court stated, "The unrebutted proof . . . at trial was that Defendant fired at least two other employees when they sought payment for their earned commissions and that Defendant was sued in a 2018 class action complaint . . . for, among other things, not

paying 'all compensation or remuneration as had been promised' by Defendant." The trial court noted that there had not been a punitive damage recovery against Wesley. On the eighth factor, whether the Defendant attempted to remedy the situation, the trial court observed that Ms. Korshoff sent Wesley two separate invoices and that the company "[i]n response . . . sent her a nasty email and then fired her . . . [and has since] t[aken] no steps at all to remedy the situation or offer [Ms. Korshoff] a prompt and fair settlement for the actual harm caused to her." Finally, since the ninth factor accounts for "any other circumstances" relevant to a punitive damages award, the trial court observed the following regarding the company's executives:

> The uncontradicted proof presented to the jury established that Defendant through Chuck McDowell would insult and belittle Defendant's employees, and even Defendant's witness April Poynter, Defendant's former Chief People Officer, admitted that such was the culture in the workplace. To avoid paying its employees their earned commissions, Defendant would fire its employees. Defendant's main witnesses, namely Robin McVey and Chuck McDowell, did not even appear at trial. Chuck McDowell did not appear at trial because he was on vacation in Africa, giving the Court and the jury the impression that he did not take this case and trial very seriously.

The trial court affirmed the jury's $7.5 million punitive damages award.

On December 10, 2021, Wesley filed a *Motion for Relief from Judgment, Motion to Alter or Amend, and Motion for New Trial*. Among other things, the company argued that the trial court did not exercise its own independent analysis of the punitive damages award, which it believed warranted relief under Tennessee Rule of Civil Procedure 59, and raised a number of same issues advanced in this appeal, namely: (1) an alleged inconsistency in awarding a verdict on both breach of contract and unjust enrichment theories; (2) an allegation that the trial court abdicated its role as thirteenth juror by approving Ms. Korshoff's retaliatory discharge claim, citing the fact that "the evidence showed only that Audrey Korshoff reported Chuck McDowell's refusal to pay her commissions to Mr. McDowell himself" rather than to some external actor; and (3) multiple objections to the jury's punitive damages award. Regarding the latter, Wesley also urged the trial court to enter a remittitur to reflect Tennessee's statutory cap on punitive damages pursuant to Tennessee Code Annotated section 29-39-104.

Ms. Korshoff responded, contending that Wesley waived many of the substantive arguments in its motion by failing to make a motion for summary judgment or directed verdict at trial and by neglecting to object to any of Ms. Korshoff's proposed jury instructions. Ms. Korshoff argued that Wesley cannot simply "change [its] mind" after making "a Conscious, Strategic, and Tactical Decision to Waive Its Now Objection." Ms. Korshoff also addressed the company's arguments on the merits. Regarding Wesley's legal inconsistency argument, Ms. Korshoff asserted that the jury's verdict demonstrates a

temporal distinction in the proof presented at trial, stating, "[t]he jury . . . returned a verdict granting [Ms. Korshoff] $60,000 in recovery for breach of contract (correlating to evidence of the commissions earned during her employment until May 1, 2019) and $201,000 for unjust enrichment; the differing amounts indicate that the jury understood [Ms. Korshoff] sustained separate losses under each theory of recovery." Regarding Wesley's argument that she needed to report the company's withholding of her commissions to an external actor to recover for retaliatory discharge, Ms. Korshoff contended that no such limitation exists under Tennessee law. Finally, Ms. Korshoff urged the trial court to retain the jury's punitive damages award.[7]

The trial court entered a *Memorandum and Order* ruling upon both parties' arguments on April 14, 2022. The trial court agreed with Ms. Korshoff that Wesley waived any argument it could have raised to both the inconsistency of the jury's verdicts and the sufficiency of the evidence for her retaliatory discharge claim by not making a motion for directed verdict during trial. Then, "[a]ssuming, *arguendo*, Wesley [did] not waive th[e]s[e] issue[s]" the trial court endorsed Ms. Korshoff's theory on the inconsistency argument that "[t]he jury . . . awarded damages on both claims based upon the two timeframes," noting that Ms. Korshoff alleged Wesley withheld her commissions, pre and post-termination. The trial court also ruled that Ms. Korshoff did not need to report Wesley's misconduct to an external actor to succeed on her retaliatory discharge claim. The trial court re-examined the punitive damages factors and concluded that punitive damages were appropriate in Ms. Korshoff's case, but the trial court reduced the award to $559,500 pursuant to the statutory damages cap found in Tennessee Code Annotated section 29-39-104.

While Wesley raises seven issues on appeal, [8] its arguments ultimately fall within

---

[7] Ms. Korshoff also raised a challenge to the constitutionality of Tennessee's cap on punitive damages, arguing that the entry of any remittitur would undermine the "guarantee to the right of trial by jury." Consistent with the requirements placed on plaintiffs challenging the constitutionality of a state statute, Ms. Korshoff sent notice of her challenge to the punitive damages cap to the Tennessee Attorney General and Reporter. *See* Tenn. R. Civ. P. 24.04. The State filed a motion to intervene and submitted a Memorandum of Law in support of the constitutionality of the damages cap. In its final *Memorandum and Order*, the trial court concluded that the statutory cap on punitive damages does not violate the federal and state constitutions, and Ms. Korshoff has not challenged the trial court's ruling on appeal.

[8] The seven issues set forth by Wesley in its briefing include:

1. Whether this Court should order a new trial.

2. Whether the trial court erred in entering judgment on Plaintiff's alternative claims for breach of contract and unjust enrichment.

3. Whether the trial court failed to properly exercise its role as the thirteenth juror concerning Plaintiff's retaliatory discharge claim when, among other things, the trial court analyzed the verdict as it would under a Motion for Judgment as a Matter of Law.

three categories. One, Wesley challenges whether the jury could find the company liable for both breach of contract and unjust enrichment. Two, Wesley challenges whether the trial court properly performed its role as thirteenth juror with regard to Ms. Korshoff's retaliatory discharge claim. Three, Wesley challenges on multiple grounds the punitive damages award. Ms. Korshoff insists that the trial court did not err and seeks an award of costs, expenses, and attorney's fees, asserting that Wesley's appeal is frivolous.

## II.

Wesley argues that, as a matter of law, a jury cannot award damages simultaneously on breach of contract and unjust enrichment claims. While Wesley concedes that "Plaintiffs may properly plead both claims," it insists that "verdicts and judgments, unlike pleadings, may not be inconsistent." In this specific context, Wesley contends that Ms. Korshoff could not recover on her unjust enrichment claim because the jury found that there was a contract and, therefore, unjust enrichment recovery is unavailable where the relationship is governed by a contract. On these bases, Wesley argues on appeal for either a new trial or elimination of the allegedly improperly awarded unjust enrichment damages.

In its *Motion for Relief from Judgment, Motion to Alter or Amend, and Motion for New Trial*, Wesley asserted that an inconsistency exists in the jury's verdict as to the contract and unjust enrichment claims. The trial court rejected Wesley's inconsistency arguments on two bases -- waiver and a determination that there was no inconsistency. The trial court found waiver based upon Wesley's failure to object to the verdict form, to contest either the jury instructions advanced by Ms. Korshoff or those set forth by the court, to offer suggested revisions to the jury instructions or propose a jury instruction to address any related concern, or to move for either summary judgment or a directed verdict. Additionally, even if Wesley's arguments were not waived, the trial court concluded that there was no actual inconsistency in the decisions reached by the jury with regard to the breach of contract and unjust enrichment claims. The trial court noted that Ms. Korshoff, in arguing to the jury, drew a distinction between contract damages related to commissions prior to the date of termination of her employment and unjust enrichment damages related

---

4. Whether the trial court erred in awarding punitive damages under *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896 (Tenn. [1992]), when Plaintiff failed to prove fraudulent conditions supporting an award of punitive damages.

5. Whether the punitive damages awarded in this case violate the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

6. Whether the punitive damages awarded in this case violate Article I, § 8, of the Tennessee Constitution.

7. Whether the trial court's judgment should be reversed.

to leads that were closed after the date of termination of her employment. The trial court observed that the jury's determination tracks this distinction having awarded the precise amount of commissions during Ms. Korshoff's time period of working for Wesley at $60,000 as contract damages and a percentage of what would have been due for leads that closed after her termination ($201,000 awarded) for unjust enrichment. On appeal, Ms. Korshoff argues that the trial court was correct with regard to its decision to reject Wesley's arguments related to purported inconsistency on both of these bases.

Ultimately, "litigants are entitled to have their rights settled by a consistent and intelligible verdict and . . . verdicts that are inconsistent and irreconcilable cannot stand." *Concrete Spaces, Inc. v. Sender*, 2 S.W.3d 901, 911 (Tenn. 1999). "Where a judgment is based upon inconsistent findings by a jury it is the duty of the appellate court to reverse and remand the case for a new trial." *Id.* Longstanding Tennessee law has provided, however, that

> It is the duty of the court in construing verdicts to give them the most favorable interpretation and to give effect to the intention of the jurors if that intention be permissible under the law and ascertainable from the phraseology of the verdict. If after an examination of the terms of the verdict the court is able to place a construction thereon that will uphold it, it is incumbent upon the court to do so.

*Briscoe v. Allison*, 290 S.W.2d 864, 868 (Tenn. 1956) (quoting Tenn. Procedure in Law Cases, Section 1504, p. 573); *see also, e.g.*, *Marshall v. Cintas Corp.*, 255 S.W.3d 60, 73 (Tenn. Ct. App. 2007).

As noted above, the trial court concluded that no inconsistency existed. In accordance with an argument advanced to the jury in closing arguments by Ms. Korshoff, which from the record before us does not appear to have drawn any objection, the trial court determined that the jury drew a distinction between pre and post-termination leads, awarding contract-based commission damages for pre-termination closed leads and unjust enrichment damages at a lesser rate than the contract commission rate in connection with leads that had not closed at the time of termination. No transcript has been provided to this court; rather, the parties are relying upon a Rule 24 statement of the evidence. Tenn. R. App. P. 24(c). Therein, the agreement between Wesley and Ms. Korshoff is described as providing that she "would be paid $250 in commission on (1) any deal that closed that she had either called personally and set up an appointment for or (2) for any deal that closed that was directly attributable to any of the leads she brought in under her position as Director of Business Development, whether she had set the appointment or not." One point of potential uncertainty is whether commissions would continue to be due after termination. Ms. Korshoff was ultimately, as determined by the jury, improperly terminated.

Wesley argues that the jury's determinations are inherently inconsistent because the

jury found a contract existed, and therefore, unjust enrichment damages are impermissible because the contract governed. This argument does not effectively address the trial court's conclusion that the distinction is a temporal one between contract-governed damages during her time of employment and unjust enrichment damages stemming from leads that closed only after her termination. The trial court concluded that the jury determined the contract fully governed the former, leads closed while Ms. Korshoff worked for Wesley, but not the latter, leads closed after Ms. Korshoff left Wesley. The trial court concluded that the evidence and argumentation supported this distinction. From our review of the record, which is limited by the parties' utilization of Rule 24 statement of evidence as opposed to a transcript, we do not see any basis for concluding that this determination was in error.

Furthermore, pursuant to Tennessee Rule of Appellate Procedure 36(a), relief need not be granted by an appellate court "to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error." In other words, "a party is not entitled to relief if the party invited error, waived an error, or failed to take whatever steps were reasonably available to cure an error." Tenn. R. App. P. 36 Advisory Comm. cmt. The trial court concluded that insofar as there is any error that Wesley invited it. There are multiple places where Wesley could have avoided what it contends is an inconsistency in connection with the jury's determination as to the contract and unjust enrichment claims. Furthermore, Wesley's contention that there is no basis for unjust enrichment award is, as noted by Ms. Korshoff, more properly viewed as a sufficiency of the evidence challenge to Ms. Korshoff's unjust enrichment claim, which is more properly addressed through a directed verdict motion.[9] Wesley, however, failed to move for a directed verdict. Additionally, there is also no indication from the record before us that Wesley objected to the distinction drawn by Ms. Korshoff in her argument to the jury during closing arguments distinguishing between pre- and post-termination damages as contract and unjust enrichment damages respectively.

To the extent that Wesley raises a sufficiency of the evidence challenge on appeal with regard to the unjust enrichment award, we note that the company failed to move for directed verdict or summary judgment at any point during the trial below. *See McLemore ex rel. McLemore v. Elizabethton Med. Investors, Ltd. P'ship*, 389 S.W.3d 764, 778 (Tenn. Ct. App. 2012) ("For this Court to review the sufficiency of the evidence on appeal, a motion for a directed verdict must have been made at the conclusion of all the proof and

---

[9] "A motion for a directed verdict provides a mechanism for determining a question of law, specifically, 'whether the plaintiff has presented sufficient evidence to create an issue of fact for the jury to decide.'" *Estrada v. DJ Exteriors, LLC*, No. M2022-01052-COA-R3-CV, 2023 WL 2442494, at *2 (Tenn. Ct. App. Mar. 10, 2023) (quoting *Brown v. Christian Bros. Univ.*, 428 S.W.3d 38, 49 (Tenn. Ct. App. 2013)), *no perm. app. filed*.

renewed in a post judgment motion following the jury's verdict."). Accordingly, insofar as Wesley is advancing a sufficiency of the evidence challenge, any such objection has been waived. *See, e.g., Boren v. Hill Boren PC*, No. W2021-00478-COA-R3-CV, 2023 WL 3375623, at *5 (Tenn. Ct. App. May 11, 2023) (deeming sufficiency challenge waived based on the appellant's "failure to move for a directed verdict following the close of all the proof"), *perm. app. denied* (Tenn. Oct. 13, 2023).

Simply stated, the trial court did not err in declining to grant relief to Wesley based upon its errant contention that the jury's determinations with regard to contract and unjust enrichment were inconsistent and unsustainable.

III.

Next, Wesley contends that a new trial should be granted with regard to Ms. Korshoff's retaliatory discharge claim based upon the failure of the trial court to properly perform its role as the thirteenth juror with regard to this claim. In its motion for new trial, Wesley argued that "[t]he Court, acting as the thirteenth juror, should also order a new trial on Audrey Korshoff[']s retaliatory discharge claim, because the proof did not contain evidence of an essential element of that claim." Wesley asserted that Ms. Korshoff had only reported wrongdoing internally within the company and thus could not prevail upon her retaliatory discharge claim. Tying this claim to the thirteenth juror standard, Wesley stated that "[t]he evidence necessarily preponderates against a verdict for a plaintiff when the evidence does not contain proof of an essential element of a plaintiff s claim."

The trial court rejected Wesley's contention. In doing so, the trial court observed the sufficiency of the evidence contention underlying Wesley's argument and concluded that by failing to move for directed verdict Wesley had waived a sufficiency of the evidence argument. The trial court, nevertheless, proceeded to assess Wesley's contention, observing that even if it was not waived, Wesley's argument fails. In reaching this conclusion, the trial court identified four elements that must be proven to support a common law claim for retaliatory discharge. The trial court then declared that "there is no doubt that Plaintiffs proved the first and third elements of a retaliatory discharge." The trial court then added that "[a]s for the second and fourth elements — Audrey Korshoff *showed* and the jury clearly believed that Audrey Korshoff exercised a right protected by public policy and the exercise of this right was a substantial factor motivating Wesley's decision to discharge Ms. Korshoff." (Emphasis added). Additionally, the trial court concluded that external reporting was not actually required for Ms. Korshoff to prevail upon her retaliatory discharge claim.

"As thirteenth juror, the trial judge must independently weigh and review the evidence presented at trial to determine whether it preponderates in favor of the verdict and decide whether he or she agrees with and is satisfied with the jury's verdict." *Meals ex rel. Meals v. Ford Motor Co.*, 417 S.W.3d 414, 420 (Tenn. 2013). Regarding the exercise of

this role by trial court judges, the Tennessee Supreme Court has observed that

> [i]n addressing a motion for a new trial, the trial court has such broad discretion that it is not bound to give reasons for its action in granting or denying a new trial based on the preponderance of the evidence. Indeed, when a trial judge approves the verdict without comment, the appellate court will presume that the trial judge has adequately performed his function as the thirteenth juror.

*Borne v. Celadon Trucking Servs., Inc.*, 532 S.W.3d 274, 308 (Tenn. 2017) (citations omitted). However, "[i]f a trial judge, in discharging his [or her] duty as a thirteenth juror, makes comments which indicate that he [or she] has misconceived his [or her] duty as a thirteenth juror, an appellate court must reverse the trial judge and remand for a new trial." *Holden v. Rannick*, 682 S.W.2d 903, 905 (Tenn. 1984).

Wesley's contention that the trial court misapprehended its role in performing its responsibility as thirteenth juror rests upon the trial court's finding of waiver. The trial court did state that Wesley had "waived its insufficiency of the evidence argument as it relates to Audrey Korshoff's retaliatory discharge claim." The trial court, however, proceeded to assess the evidence as it relates to Ms. Korshoff's retaliatory discharge claim. In doing so, the trial court expressly concluded "that there is no doubt that [Ms. Korshoff] proved the first and third elements." As to the second and forth elements of common law retaliatory discharge, the trial court determined that she had "showed . . . Audrey Korshoff exercised a right protected by public policy and the exercise of this right was a substantial factor motivating Wesley's decision to discharge Ms. Korshoff." The trial court's manner of addressing the retaliatory discharge argument is tied to how Wesley framed its argument in seeking a new trial. What Wesley styled as a thirteenth juror argument heavily overlapped with a standard sufficiency of the evidence argument. Under these circumstances, there is simply no basis for overcoming the presumption that the trial court judge properly performed her role as the thirteenth juror. To the contrary, the trial court expressly concluded that Ms. Korshoff successfully proved her case.

On appeal, Wesley continues to touch briefly upon sufficiency-based aspects of this argument. While asserting that the trial court's "substantive analysis" of requirements of retaliatory discharge "was plainly wrong," Wesley concedes that this matter is "not directly at issue in this appeal." In addition to conceding that the matter is not before this court, any sufficiency argument was also waived when the company failed to move for directed verdict or summary judgment at any point during the trial below. *See McLemore ex rel. McLemore*, 389 S.W.3d at 778 ("For this Court to review the sufficiency of the evidence on appeal, a motion for a directed verdict must have been made at the conclusion of all the proof and renewed in a post judgment motion following the jury's verdict."). Accordingly, insofar as Wesley is advancing a sufficiency of the evidence challenge, any such objection has been waived. *See, e.g., Boren*, 2023 WL 3375623, at *5 (deeming sufficiency

- 13 -

challenge waived based on the appellant's "failure to move for a directed verdict following the close of all the proof").

## IV.

Wesley also challenges the punitive damages award in the present case. It does so on four different grounds. One, assuming that the unjust enrichment award is eliminated, Wesley asserts there must be a corresponding reduction of the punitive damages award to meet the demands of the statutory cap on punitive damages. Two, Wesley argues that punitive damages are unavailable in this case because it did not act maliciously, intentionally, fraudulently, or recklessly and cause injury. Three, Wesley contends that the trial court erred in its assessment of the punitive damage factors. Four, Wesley contends that the award of punitive damages, even having been lowered to the statutory maximum, is unconstitutional under the Due Process Clause of the United States Constitution and Article 1, Section 8 of the Tennessee Constitution.

## A.

Wesley's first argument rises and falls on appeal based upon the success of its contention that the unjust enrichment award should be eliminated. If the unjust enrichment award is neither reduced nor eliminated, then there is no corresponding reduction of the punitive damages that becomes necessary. Having determined that Wesley's argument with regard to the unjust enrichment award is unavailing, we conclude that no attendant reduction in the punitive damages award is necessary on that basis.

## B.

Wesley's next argues that the jury did not determine that it acted maliciously, intentionally, fraudulently, or recklessly and caused injury by doing so. Therefore, it reasons that an award of any punitive damages is in error. Wesley's argument appears to be primarily grounded upon its understanding of the jury verdicts in the present case. Having asserted that punitive damages are rarely appropriate in cases involving contract disputes, Wesley points to the jury's determination that Ms. Korshoff proved her intentional misrepresentation claim while declining to award Ms. Korshoff further damages for intentional misrepresentation. This is the central axis of its argument. In Wesley's view, the jury, therefore, necessarily concluded there was no harm resulting from its intentional misrepresentation. Ms. Korshoff argues this is a misreading of the jury's verdicts. Moreover, she also notes that the jury found for and awarded Ms. Korshoff damages for her contract, unjust enrichment, and retaliatory discharge claims, and that the jury found for Ms. Korshoff on her intentional misrepresentation claim.

Wesley's argument is unavailing. Addressing punitive damages, the jury's instructions included, in part, the following:

- 14 -

Punitive damages may be considered if, and only if, the plaintiff has shown by clear and convincing evidence that a defendant has acted intentionally, recklessly, maliciously, or fraudulently. . . .

A person acts intentionally when it is the person's purpose or desire to do a wrongful act or to cause the result.

A person acts recklessly when the person is aware of, but consciously disregards a substantial and unjustifiable risk of injury or damage to another. Disregarding the risk must be a gross deviation from the standard of care that an ordinary person would use under all the circumstances.

A person acts maliciously when the person is motivated by ill will, hatred or personal spite.

A person acts fraudulently when: (1) the person intentionally either misrepresents an existing material fact or causes a false impression of an existing material fact to mislead or to obtain an unfair or undue advantage; and (2) another person suffers injury or loss because of reasonable reliance upon that representation.

Having been provided with these instructions, the jury concluded that punitive damages are warranted in this case. Additionally, the jury instructions regarding Ms. Korshoff's claim of intentional misrepresentation provide as an element thereof that "as a result of plaintiffs reliance upon the truth of the representation, the plaintiff sustained damage." The jury determined that she proved "all of the elements of the claim for intentional misrepresentation."

In considering Wesley's arguments, the trial court observed that Wesley's actions were not accidental but intentional and that Wesley had generated a pretextual reason for Ms. Korshoff's termination. The trial court determined that Wesley engaged in wage theft and caused injuries to Ms. Korshoff. Wesley was, as the trial court concluded, in a position of power over Ms. Korshoff and understood her financial vulnerabilities. Despite being aware of her financial vulnerability and that it owed this money to Ms. Korshoff, Wesley attempted to keep the money it owed to Ms. Korshoff and to conceal what it was doing by generating a pretextual basis for her termination. Wesley persisted in denying that it owed commissions.

Wesley has not argued to either the trial court or to this court on appeal that there was any error in the instructions given to the jury. "It is presumed that jurors understand and follow the court's instructions." *Mercer v. Vanderbilt Univ., Inc.*, 134 S.W.3d 121, 134 (Tenn. 2004). The Tennessee Supreme Court has indicated that punitive damages can

- 15 -

be awarded in cases involving disputes over contracts. *Rogers v. Louisville Land Co.*, 367 S.W.3d 196, 211-12 n.14 (Tenn. 2012). A punitive damages award in a case centering upon a contract dispute is appropriate where the standards for punitive damages are satisfied. *Riad v. Erie Ins. Exch.*, 436 S.W.3d 256, 276 (Tenn. Ct. App. 2013). There is nothing in this case to indicate that the jury did not properly consider its charge or resolve the question of whether punitive damages were warranted. Wesley's interpretation of the jury's verdict as to the damage award for Ms. Korshoff's intentional misrepresentation claim simply cannot bear the weight that Wesley places upon it. The jury was instructed and concluded punitive damages are warranted in this case. The jury's determination not to award further damages in connection with Ms. Korshoff's intentional misrepresentation claim does not invalidate its decision as to punitive damages.

C.

Wesley next contends that the trial court misapplied the punitive damage factors when assessing the jury's punitive damages award and ultimately upholding an award of punitive damages although reducing the award to satisfy the statutory cap under Tennessee Code Annotated section 29-39-104(a)(5). The Tennessee General Assembly has provided that

> In all cases involving an award of punitive damages, the trier of fact, in determining the amount of punitive damages, shall consider, to the extent relevant, the following: the defendant's financial condition and net worth; the nature and reprehensibility of the defendant's wrongdoing; the impact of the defendant's conduct on the plaintiff; the relationship of the defendant to the plaintiff; the defendant's awareness of the amount of harm being caused and the defendant's motivation in causing such harm; the duration of the defendant's misconduct and whether the defendant attempted to conceal such misconduct; the expense plaintiff has borne in attempts to recover the losses; whether the defendant profited from the activity, and if defendant did profit, whether the punitive award should be in excess of the profit in order to deter similar future behavior; whether, and the extent to which, defendant has been subjected to previous punitive damage awards based upon the same wrongful act; whether, once the misconduct became known to defendant, defendant took remedial action or attempted to make amends by offering a prompt and fair settlement for actual harm caused; and any other circumstances shown by the evidence that bear on determining a proper amount of punitive damages. . . .

Tenn. Code Ann. § 29-39-104(a)(4).

The Tennessee Supreme Court has directed that "the trial court must thoroughly review any award of punitive damages made by the jury." *Coffey v. Fayette Tubular Prod.*,

929 S.W.2d 326, 328 (Tenn. 1996). To satisfy this requirement, "[i]n jury cases the trial judge must review the jury's award of punitive damages and 'clearly set forth the reasons for decreasing or approving all punitive awards in findings of fact and conclusions of law demonstrating a consideration of all factors on which the jury is instructed.'" *Culbreath v. First Tenn. Bank Nat. Ass'n*, 44 S.W.3d 518, 528 (Tenn. 2001) (quoting *Hodges*, 833 S.W.2d at 902). This review in punitive damages cases "is referred to as a *Hodges* review,"[10] in reference to the Tennessee Supreme Court decision setting forth this obligation. *See generally Hodges*, 833 S.W.2d 896.

The trial court addressed the factors twice. The trial court made its initial assessment in the *Final Judgment on Jury Verdict* and further assessed the factors in ruling upon Wesley's *Motion for Relief from Judgment, Motion to Alter or Amend, and Motion for New Trial* in the trial court's *Memorandum and Order*. In its initial assessment, the trial court stated the following:

> The first factor considered by the jury was the net worth and financial condition of Defendant Wesley Financial Group, LLC. Uncontradicted proof was presented to the jury that Defendant had an annual revenue of $28,504,252.30 in 2018, which jumped to almost $79,894,786.79 in 2019, and jumped again to $104,420,735.12 in 2020. Uncontradicted proof was also presented that Defendant has two offices, one in Franklin, Tennessee, and one in Las Vegas, Nevada.

> The second factor was the objectionable nature of Defendant's wrongdoing, the impact of the Defendant's conduct on the Plaintiff, and the relationship of the parties. Uncontradicted proof was presented to the jury that, because of the Defendant's conduct, Plaintiff Audrey Korshoff lost her job, home, and livelihood. She had a great deal of trouble seeking and finding other employment. She lost her home because she could not afford the mortgage payments after Defendant refused to pay her and then fired her under the pretext of "attendance," when the actual reason for which Plaintiff Audrey Korshoff was fired was because she sought payment for her earned commissions. She had never been fired from a job for any alleged deficiency in her performance, and she had never been yelled at nor humiliated at a company meeting simply for asking for her earned commissions, and the Court was of the opinion that this had a devastating effect on her and her family.

> The third factor was the Defendant's awareness of the amount of harm being caused and the Defendant's motivation in causing the harm. Uncontradicted proof was presented to the jury that Defendant knew from

---

[10] *McLemore*, 389 S.W.3d at 780.

- 17 -

early conversations with Plaintiff Audrey Korshoff that she was a single mother who was looking to refinance her home and needed a W-2 in order to do so. Defendant hired Plaintiff initially as a Qualification Specialist at $12/hour plus commissions on each lead that she qualified so that she could learn how the company worked with the understanding that she would become its Director of Business Development. Approximately three weeks later, Plaintiff Audrey Korshoff was promoted to Director of Business Development as originally contemplated by the parties, which was a salaried position of $50,000 per year plus commissions on each lead that closed regardless of whether she personally qualified the lead as long as they were attributable to the business development team. She also had the option to qualify leads in order to earn more money should she have any free time. However, Defendant and Plaintiff quickly realized that she could not perform her duties in her new role plus qualify leads as before in order to make up for the low starting salary. Because leads were not coming in at that time, Plaintiff had trouble making ends meet. So Defendant raised her salary to $75,000 per year with the same commission structure as before and additionally gave her a bonus of $5,000 because Defendant was happy with Plaintiff's work and to help her out on her bills until the leads Plaintiff was generating started to come in. Thus, based on the uncontradicted proof, Defendant was well aware of Plaintiffs' financial difficulties while she worked on building her business initiatives for Defendant. Defendant was openly complimentary of Plaintiff's work in meetings and emails until the money started coming in and she sought payment for her earned commissions. Defendant's motivation in causing Plaintiff harm, that is, by firing her, was motivated by its motive of retaining all of the profit attributable to Plaintiff's work.

The fourth factor was the duration of the Defendant's misconduct and whether the Defendant attempted to conceal the conduct. Uncontradicted proof was presented to the jury that Defendant paid Plaintiff in accordance with their agreement until after January 25, 2019. Defendant continually refused to pay Plaintiff and rebuffed her until May 1, 2019, when Defendant ultimately fired Plaintiff under the pretext of "attendance." In the days leading up to Plaintiff's firing, on April 30, 2019, and May 1, 2019, Chuck McDowell, Defendant's CEO, sent Plaintiff nasty emails belittling her because she again sent an invoice to Defendant asking Defendant to pay her on her earned commissions. Chuck McDowell also yelled at and humiliated her at a company meeting in April 2019. Defendant attempted to conceal its conduct by stating in the Separation Notice that Plaintiff was being fired for "attendance." However, Defendant admitted in its interrogatories and through Mr. Charles McDowell, Chief Marketing Officer on cross-examination, that Defendant never wrote Plaintiff up for any infraction, let

alone any for "attendance." Defendant fired Plaintiff Audrey Korshoff for attendance despite the fact that she was given a laptop so that she could work from any location and outside of normal office hours, and no one complained of her attendance until right before she was fired.

The fifth factor was the amount of money the Plaintiff has spent in attempt to recover the losses. No evidence was presented regarding this factor.

The sixth factor was whether the Defendant profited from the activity, and if so, whether the punitive award should be in excess of the profit in order to deter similar future behavior. Uncontradicted proof was presented to the jury that Defendant profited from the activity. As noted above, the proof at trial relating to Defendants financial condition showed that it had revenue of $28,504,252.30 in 2018, which jumped to almost $79,894,786.79 in 2019, and jumped again to $104,420,735.12 in 2020. Based on this explosive growth, Defendant certainly benefited from Plaintiff's work because of the stream of customers generated from her work. By firing Plaintiff, Defendant retained all of the money on the closed leads attributable to MRP, trade shows, and referral rock program that it would have had to pay Plaintiff, plus her salary and benefits. The Court is of the opinion that the punitive award should be significant so as to deter similar future behavior both on the part of the Defendant, and on the part of others who might attempt to do to the Plaintiff what has been done in this case.

The seventh factor was the number and amount of previous punitive damage awards against the Defendant based upon the same wrongful act. The unrebutted proof presented to the jury at trial was that Defendant fired at least two other employees when they sought payment for their earned commissions and that Defendant was sued in a 2016 class action complaint in the Middle District of Tennessee for, among other things, not paying "all compensation or remuneration as had been promised" by Defendant. There had not been any punitive damage awards against Defendant for the same wrongful act.

The eighth factor was whether once the misconduct became known to the defendant, the defendant tried to remedy the situation or offered a prompt and fair settlement for the actual harm caused. Based on the uncontradicted proof, when Plaintiff was still not paid on commissions that had accrued since January 22, 2019, she sent Defendant an invoice dated April 30, 2019, totaling $60,000 in earned commissions, and making Defendant aware that it still had not paid her daughter for working two of Defendant's trade show booths in March 2019. In response to Plaintiff's invoice, Chuck McDowell

sent her a nasty email and then fired her. Plaintiff tried to offer a settlement, which Defendant rebuffed and continually refused to pay her. Defendant took no steps at all to remedy the situation or offer Plaintiff a prompt and fair settlement for the actual harm caused to her. Rather, Defendant's position at trial, which the jury apparently rejected, was that Defendant did not enter into an agreement with Plaintiff. Defendant was firm in its position despite the fact that Plaintiff presented uncontradicted pay stubs showing that Defendant did pay her for a period of time in accordance with such agreement.

Finally, the ninth factor was any other circumstances shown by the evidence that bears on determining the proper amount of the punitive award. The uncontradicted proof presented to the jury established that Defendant through Chuck McDowell would insult and belittle Defendant's employees, and even Defendant's witness April Poynter, Defendant's former Chief People Officer, admitted that such was the culture in the workplace. To avoid paying its employees their earned commissions, Defendant would fire its employees. Defendant's main witnesses, namely Robin McVey and Chuck McDowell, did not even appear at trial. Chuck McDowell did not appear at trial because he was on vacation in Africa, giving the Court and the jury the impression that he did not take this case and trial very seriously.

Assessing the punitive damages factors in response to Wesley's *Motion for Relief from Judgment, Motion to Alter or Amend, and Motion for New Trial*, the trial court stated the following:

(1)   In 2018, Wesley had annual revenue of $28,504,252.30. In 2019, Wesley's annual revenue increased to $79,894,786.79. In 2020, Wesley's annual revenue again increased substantially and was $104,420,735.12. Wesley's explosive growth was due, in large part, to Audrey Korshoff obtaining the AARP account and the tremendous leads on that account. Thirty-six percent of Audrey Korshoff's contracts sent to AARP closed. In other areas, twenty percent was the average. So, AARP was a very good lead source. Also, the average AARP sale is $11,136 whereas in other areas, the average sale is $8,800. Wesley has two offices — one located in Franklin, Tennessee, and one located in Las Vegas, Nevada. Wesley did not present any evidence to the contrary nor did it provide any evidence at trial of its expenses or debts. The evidence produced at trial establishes that Wesley is financially stable and doing quite well.

(2)   Wesley's conduct amounts to wage theft. Wesley entered into an agreement with Audrey Korshoff and reneged on the agreement. Then, when Audrey Korshoff attempted to collect on her agreement, Wesley fired her for

"attendance," an issue that had never been raised during Audrey Korshoff's employment. In essence, Wesley removed Audrey Korshoff after Wesley realized the fruit of her labor in order to keep the profits for itself. Further, the evidence established that Audrey Korshoff was given a laptop to work remotely and outside normal business hours, which circumstantially established that Wesley's reason for firing Audrey Korshoff was mere pretext. Afterwards, Wesley denied that it ever made an agreement with Audrey Korshoff despite paying her pursuant to the agreement. Wesley's behavior was not accidental, but intentional. As a result of Wesley's behavior, Audrey Korshoff suffered financial distress, including the loss of her home in which she and her minor child resided. Wesley was in a position of power over Audrey Korshoff as her employer. She relied on Wesley for her bread and butter and to support her children as a single mother. To top it off, Wesley refused to pay Audrey Korshoff's minor daughter, [M.K.], who Audrey Korshoff had convinced to come help her at two weekend trade shows because no other Wesley employees were willing to work the weekend trade shows.

(3) Wesley was aware of Audrey Korshoff's financial struggles and knew that Ms. Korshoff was a single mother. Wesley hired Audrey Korshoff as a Qualification Specialist at $12 an hour plus commissions. Three weeks later, Wesley promoted Audrey Korshoff to Director of Business Development with a salary of $50,000 per year plus commissions with the option to qualify leads. Audrey Korshoff would not have been willing to work for $50,000 per year unless she would also be paid the $250 commission. Because leads were not rapidly coming in at that time, Wesley raised Ms. Korshoff's salary to $75,000 per year with a $5,000 bonus. This pay increase maintained the parties' agreement that Wesley would pay Audrey Korshoff $250 for every lead closed. For Wesley to increase Audrey Korshoff's salary in such a short amount of time establishes that some form of agreement occurred in order to financially assist Audrey Korshoff.

(4) Wesley's conduct ranged from January 25, 2019 to May 1, 2019 before Wesley terminated Audrey Korshoff. Prior to Audrey Korshoff's termination, Wesley's CEO, Chuck McDowell, belittled Audrey Korshoff in emails and in company meetings. Wesley's reason for terminating Audrey Korshoff was "attendance." However, there is no record that Wesley ever disciplined Audrey Korshoff for attendance problems. Company policy required that employees be reprimanded incrementally before termination. Further, Wesley provided Audrey Korshoff a laptop so that she could work at any time and in any location. Moreover, prior to Audrey Korshoff requesting her pay, both Chuck McDowell and Robin McVey praised her work. Once Ms. Korshoff began to pursue her pay, the tide changed and

Chuck McDowell began to berate and belittle Ms. Korshoff during company meetings in the presence of other employees. The evidence established that Wesley terminated Audrey Korshoff as a response to Audrey Korshoff's asking Wesley to honor the parties' agreement. Wesley attempted to hide this fact by claiming it terminated Audrey for attendance problems.

(5) Although Audrey Korshoff did not submit any evidence at trial establishing the amount of expense she has incurred in an attempt to recover her losses, she presented proof via her testimony that she attempted for many months to get Wesley to pay her what it owed her and she made numerous requests of Wesley to pay her and to settle the matter.

(6) Wesley profited off of its activity by discharging Audrey Korshoff and keeping the money it should have paid her. Further, after terminating Audrey Korshoff, Wesley outright denied entering into an agreement with her despite having already acted on the agreement by paying Audrey Korshoff pursuant to the agreement. Charles McDowell testified that, had Audrey Korshoff been paid pursuant to the agreement - $250 for every lead closed — she would have received commissions in the amount of $3 million to $6 million.

(7) There is no evidence that Wesley has been subjected to previous punitive damages awards based upon the same wrongful conduct. However, evidence was submitted demonstrating that Wesley was subjected to a class action lawsuit in 2016 in the Middle District Court of Tennessee for claims similar to Audrey Korshoff's claims. In addition, Wesley fired two other employees when they complained that Wesley would not pay them what was promised them.

(8) The evidence demonstrates that Wesley never tried to remedy the situation. Audrey Korshoff remains unpaid. After Audrey Korshoff sent Wesley an invoice on April 30, 2019, Chuck McDowell replied with a vitriolic email and fired her. Audrey Korshoff's attempts to settle were rebuffed and Wesley continuously denied that an agreement ever existed despite evidence to the contrary. In particular, Wesley acted upon the agreement by paying Audrey Korshoff until January 25, 2019.

(9) The evidence at trial established that what happened to Audrey Korshoff was not the first time Wesley fired an employee to avoid paying commissions. Wesley fired two other employees when they complained that they were not paid what they were owed. Also, Wesley was sued in federal court in 2016 for conduct similar to the conduct it perpetrated on Audrey Korshoff.

Wesley does not dispute that the trial court conducted a review of the relevant factors or the thoroughness of the trial court's performance of this role; rather, Wesley contends that the trial court misapplied the factors. If the factors were applied correctly, Wesley insists "no punitive damages should be awarded at all." Wesley asserts five errors of application. One, Wesley argues that, in considering the duration of its misconduct, its misconduct lasted only a few months and, accordingly, it should be regarded as short-lived. Two, in considering whether Wesley attempted to conceal its misconduct, Wesley contends that the trial court should have concluded that it did not attempt to conceal its misconduct because Wesley did not hide that it failed to pay Ms. Korshoff's commissions. Three, Wesley argues that, in assessing its awareness of the amount of harm that it was causing, the trial court "made some leaps in reasoning" in concluding that Wesley was aware of the harm that it was causing. Four, Wesley argues that in assessing its profit from the activity at issue the trial court should have kept its consideration limited solely to the unpaid commissions it failed to pay and not considered the profits generated from Ms. Korshoff's business development. Fifth, Wesley argues that the trial court improperly relied solely upon its total revenue in assessing the company's financial condition and net worth. Wesley notes that companies can have significant expenses preventing revenue from providing an accurate understanding of the company's net worth, financial condition, or profits.

We turn to Wesley's first contention that its conduct should be considered short-lived because its misconduct only lasted for a few months. Wesley offers no authority to support its contention that a few months must be regarded as a short-lived time period in which to engage in misconduct. We discern no error in the trial court viewing months of failing to respond to requests from an employee for payment due, berating and belittling the employee in response to requests for her due compensation, and developing a pretextual basis for termination as not being short-lived misconduct.

Next, we consider Wesley's argument that the trial court erred in considering its actions as attempting to conceal its misconduct. Wesley insists that it openly admitted that it had not paid Ms. Korshoff commissions because she was entitled to no such commissions. The trial court noted Wesley's denial of its obligation to pay commissions and its response to Ms. Korshoff's request for payment by developing a pretextual basis for her termination. This pretextual termination is plainly related to Ms. Korshoff's retaliatory discharge claim and punitive damages in connection therewith. Generating a pretextual basis for termination is an attempt to conceal misconduct in connection with the reason for Ms. Korshoff's termination. Furthermore, the trial court's analysis also draws a connection between the unpaid commissions and the development of a pretextual basis for termination. The question of why Wesley terminated Ms. Korshoff is not only of impact in considering the retaliatory discharge. That Wesley created a pretextual basis for terminating Ms. Korshoff also helps reinforce her claim to commissions on closed leads. Ms. Korshoff is making the case that she was terminated in response to seeking to be paid what she was due. The development of a pretextual basis for terminating Ms. Korshoff

offers an explanation for the termination under which Wesley can contend, as it did, that it did not actually agree to pay commissions and that she was instead actually terminated for a perfectly valid reason. We discern no error in the trial court regarding Wesley's actions as attempting to conceal its misconduct.

The third asserted argument for misapplication of the punitive damages factors advanced by Wesley is that the trial court "made some leaps in reasoning" in concluding that Wesley was aware of Ms. Korshoff's financial struggles, most especially that these financial struggles persisted after Wesley gave her a raise. As noted above, the parties have failed to provide a transcript and have instead relied upon Rule 24 statement of the evidence. With regard to Wesley's knowledge of Ms. Korshoff's financial distress, the Rule 24 statement of evidence indicates that Wesley "was aware that Audrey Korshoff was a single mother, and Audrey Korshoff told Robin McVey and Chuck McDowell about her financial struggles on numerous occasions." From the record before us, we have no basis for concluding that the trial court made errant leaps of reasoning in concluding that the evidence indicated Wesley was aware of the significant financial strain that Ms. Korshoff was under.

Wesley's fourth assertion of error in the application of the factors relates to the trial court's consideration of Wesley's profits from leads generated by Ms. Korshoff, rather than solely Wesley's profit from retaining the money for the commissions that it was supposed to pay. In advancing this argument, Wesley cites the trial court's discussion of profits in its *Final Judgment on Jury Verdict*. With regard to the trial court's consideration of profits stemming from leads developed by Ms. Korshoff in its earlier order, Wesley fails to offer any authority indicating that this is an improper consideration when assessing profit. It is not apparent why such consideration would be in error under the facts of the present case. Wesley induced Ms. Korshoff to take a position of employment, developing leads that generated enormous revenue increases for the company, based on an agreement to pay commissions that Wesley later declined to pay and which it denied were due. It appears that Wesley's profits from Ms. Korshoff's leads are interconnected with its misconduct. Even if we assume for purposes of argument, however, that Wesley is correct and that the profits factor should have been narrowly circumscribed to the profits of retained commissions themselves exclusively, Wesley has failed to address the trial court's later analysis. Wesley fails to address the trial court's analysis of profits in its subsequent *Memorandum and Opinion* wherein the trial court addressed the profit factor in response to Wesley's *Motion for Relief from Judgment, Motion to Alter or Amend, and Motion for New Trial*. In responding to Wesley's motion, the trial court did analyze profits purely in relation to retained profits. The trial court noted the testimony Charles McDowell "that, had Audrey Korshoff been paid pursuant to the agreement - $250 for every closed — she would have received commissions in the amount of $3 million to $6 million." Accordingly, we find no basis for reversing the trial court in connection with its analysis of Wesley's profits.

- 24 -

Wesley's fifth assertion of error relates to the trial court's analysis of the net worth and financial condition factor. Wesley argues the trial court erred by only considering annual revenue totals over three years in analyzing this factor. As with the previous argument regarding profit, Wesley, however, fails to address the additional analysis of this factor set forth in the trial court's *Memorandum and Order*. Therein, the trial court observed, as it did in its earlier order, Wesley's rapidly increasing and substantial annual revenue of $28,504,252.30 (2018), $79,894,786.79 (2019), and $104,420,735.12 (2020). In doing so, the trial court noted the significant role Ms. Korshoff played in this explosive growth. Additionally, the trial court addressed the several-thousand-dollar higher average sale for Wesley in connection with the AARP leads developed by Ms. Korshoff in comparison with the sale value of Wesley's average customer. Based upon the evidence before it, the trial court ultimately determined that "Wesley is financially stable and doing quite well." Responding to Wesley's motion, which raised a contention related to revenue considerations being potentially misleading for some companies by failing to account for debt, the trial court noted Wesley's failure to "provide any evidence at trial of its expenses or debts." On appeal before this court, Wesley fails to address the trial court's further examination of this financial factor. Having failed to offer a challenge to the trial court's ultimate analysis, we cannot find any error by the trial court on this basis.

D.

Referencing the Due Process Clause of the Fourteenth Amendment and Article I, Section 8 of the Tennessee Constitution, Wesley asserts based upon constitutional guideposts[11] that the punitive damages award should be entirely eliminated. While Wesley references Article I, Section 8 of the Tennessee Constitution in its briefing before this court, it fails to develop any argument in connection therewith. Accordingly, we conclude that Wesley has waived any argument based upon the punitive damages award violating Article I, Section 8 of the Tennessee Constitution. *See Sneed v. Bd. of Pro. Resp.*, 301 S.W.3d 603, 615 (Tenn. 2010) ("It is not the role of the courts, trial or appellate, to research or construct a litigant's case or arguments for him or her, and where a party fails to develop an argument in support of his or her contention or merely constructs a skeletal argument, the issue is waived.").

Problematically, as noted by Ms. Korshoff, Wesley did not actually seek complete elimination of the punitive damage award before the trial court based upon its constitutional

---

[11] In its brief, Wesley cites several cases decided by the United States Supreme Court that establish the "guideposts" relevant to assessing the constitutionality of punitive damages awards. *See BMW of N.A., Inc. v. Gore*, 517 U.S. 559, 575-85 (1996). In *Gore*, the Supreme Court indicated that the appropriateness of a punitive damages award may be evaluated based on three such guideposts: the degree of reprehensibility of the defendant's conduct, the ratio of compensatory to punitive damages awarded to a particular plaintiff, and the comparable punitive damages awards arising from the same or similar conduct. *Id.* In its briefing, Wesley addresses each of these factors in some detail, arguing that the jury's punitive damages award should be voided on that basis.

guideposts argument. Wesley did raise a constitutional guideposts argument before the trial court but argued only for a reduction of the punitive damages award, not for its total elimination. The punitive damages award had been at a 27-to-1 ratio of punitive to compensatory damages. Wesley argued before the trial court that "the total amount awarded by the jury was excessive, and the Court should reduce the award, as required by the Due Process Clause of the Fourteenth Amendment to the United States Constitution." Summarizing its constitutional guideposts argument, Wesley stated in its briefing before the trial court that "Wesley respectfully submits this Court should drastically reduce the amount of punitive damages awarded." As for how much of a reduction would be appropriate, Wesley argued for reducing the 27-to-1 award to something closer to a 4-to-1 punitive to compensatory damages ratio, which it asserted was "close to the line" with regard to constitutional propriety. Based upon a separate argument made by Wesley regarding the applicability of the Tennessee statutory cap on punitive damages, the trial court did drastically reduce the punitive damages award. The trial court actually went even beyond the 4-to-1 ratio referenced by Wesley, reducing the punitive damages award to a 2-to-1 ratio of punitive to compensatory damages.

The trial court granted Wesley the relief it requested pursuant to its constitutional guideposts argument, though doing so based on a different rationale. Having already afforded the requested relief, the trial court did not rule upon Wesley's constitutional guideposts argument. Wesley, nevertheless, asserts error on appeal. However, Wesley obtained the relief it sought before the trial court in advancing this argument and cannot secure a reversal on appeal for a trial court granting it what it sought, though doing so on another basis. *See* 4 C.J.S. Appeal and Error § 252 (stating "that a party secured the relief demanded on a different ground than the one urged . . . does not permit an appeal").

V.

Ms. Korshoff also contends that Wesley's appeal was frivolously filed, entitling her to attorney's fees pursuant to Tennessee Code Annotated section 27-1-122. According to that statute,

> When it appears to any reviewing court that the appeal from any court of record was frivolous or taken solely for delay, the court may, either upon motion of a party or of its own motion, award just damages against the appellant, which may include but need not be limited to, costs, interest on the judgment, and expenses incurred by the appellee as a result of the appeal.

The frivolous appeal statute "must be interpreted and applied strictly so as not to discourage legitimate appeals." *Davis v. Gulf Ins. Grp.*, 546 S.W.2d 583, 586 (Tenn. 1977); *Wakefield v. Longmire*, 54 S.W.3d 300, 304 (Tenn. Ct. App. 2001); *see also, e.g., GSB Contractors, Inc. v. Hess*, 179 S.W.3d 535, 547 (Tenn. Ct. App. 2005). "Imposing a penalty for a frivolous appeal is a remedy which is to be used only in obvious cases of frivolity and

should not be asserted lightly or granted unless clearly applicable—which is rare." *Conder v. Salyers*, 421 S.W.3d 589, 597 (Tenn. Ct. App. 2013) (quoting *Henderson v. SAIA, Inc.*, 318 S.W.3d 328, 342 (Tenn. 2010)).  Nevertheless, "[s]uccessful litigants should not have to bear the expense and vexation of groundless appeals." *Davis*, 546 S.W.2d at 586; *see also, e.g., Glanton v. Lord*, 183 S.W.3d 391, 401 (Tenn. Ct. App. 2005); *Jackson v. Aldridge*, 6 S.W.3d 501, 504 (Tenn. Ct. App. 1999).  Ultimately, "[t]he award of damages for the filing of a frivolous appeal lies within the sound discretion of this Court." *GSB Contractors, Inc.*, 179 S.W.3d at 547; *see also, e.g., Chiozza v. Chiozza*, 315 S.W.3d 482, 493 (Tenn. Ct. App. 2009).

Wesley offered thoughtful arguments on appeal in opposition to both compensatory and punitive damages awarded in the present case.  While Wesley's appeal was ultimately unsuccessful, we cannot say that it was frivolous.

## VI.

In considering the arguments advanced on appeal and for the reasons discussed above, we affirm judgment of the trial court.  The costs of the appeal are taxed to the appellant, Wesley Financial Group, for which execution may issue if necessary.  The case is remanded for such further proceedings as may be necessary and consistent with this opinion.

_____
JEFFREY USMAN, JUDGE